STEPHEN J. WINDHORST, Judge.
| ¡.Defendant, Carl Baham, was convicted of attempted second degree murder of Byron C. Matthews, Jr. in violation of La. R.S. 14:27:30.1 (count one) and illegal use of a weapon while committing a crime of violence as to Matthews’ two children in violation of La. R.S. 14:94 F (counts two and three). Defendant was sentenced to imprisonment at hard labor for fifty years without benefit of parole, probation, or suspension of sentence on count one; imprisonment at hard labor for twenty years without benefit of parole, probation, or suspension of sentence on count two; and imprisonment at hard labor for ten years without benefit of parole, probation, or suspension of sentence on count three, with the sentences on counts one and two to run concurrently with one another, and the sentence on count three to run consecutively to the sentences on counts one and two. For the reasons that follow, we affirm defendant’s convictions and sentences and remand this matter for correction of the commitment.
J^FACTS
On July 25, 2013, at approximately 4:00 P.M., Byron Matthews, Jr. picked up his children, a two-year-old boy and a five-month-old girl,[1] from a daycare facility and drove them to his mother’s house at 1616 Apache Drive, an apartment complex in Marrero. Matthews’ son was seated in the rear driver’s side seat, and his daughter was seated in the rear passenger’s side seat. When Matthews arrived at his mother’s residence, he brought his car to a stop on the curb in front of the door. Matthews exited his car and walked around the front to the rear passenger’s door. He was about to unbuckle his daughter’s seat belt when he saw somebody with a gun exit a black Nissan. Matthews made eye contact with that individual and then walked around, got back inside of his car, and started it. At that time, he heard gunshots.
When Matthews realized that his car had been hit, he backed up, turned the car around, put his foot on the brake, and “hopped” toward the back seat to cover his daughter.[2] Matthews then went to the *562 main office of the apartment complex. When he arrived, he looked in the back seat and saw blood and his son pointing toward his face. He put his son in his lap and drove to Ochsner Hospital on the Westbank.[3] Matthews pulled up to the hospital and told two nurses that his son had been shot. The nurses grabbed his children and took them inside for medical treatment.[4]
| ¿Matthews told the police that he did not know the individual who shot at him. He identified defendant as the shooter in a photographic lineup and in court during the trial. Matthews testified that he did not have an AK-47 in his car when he picked up his children, nor did he shoot an AK-47 next to the car where his children were present. He did not shoot anyone that day. Matthews further testified he has never owned a firearm.
JPSO Deputy William Boersma was dispatched to Ochsner Hospital in connection with a shooting. Deputy Boersma met with Matthews who told him what had happened. Matthews gave the police permission to search inside of his car. Deputies examined Matthews’ vehicle and observed a bullet hole in the rear driver’s side door where a bullet had apparently gone through and struck Matthews’ son in the face. Matthews told the deputies that the bullet hole was not there previously. One projectile and a child’s tooth were found inside the vehicle.
JPSO Deputy Jerry Pettit went to the crime scene and found four fired cartridge casings on Apache Street and two projectiles on the “other side of the gate.”[5]
The day after the incident, JPSO Detective Sergeant Eddie Klein obtained information that a subject by the nickname of “Dooney” was responsible for the shooting and subsequently determined that defendant went by that nickname. Additionally, Matthews’ description of the suspect vehicle matched a vehicle associated with defendant, namely, a black Nissan. Detective Klein presented a photographic lineup to Matthews, after which Matthews positively identified defendant as the perpetrator.
IsSgt. Klein and another deputy went to defendant’s residence at 6144 Ray Street in Marrero, knocked on the door, and defendant and Joshua Hawkins walked outside. Deputies conducted a safety pat down on defendant and Hawkins and found a 9 mm handgun in Hawkins’ right front pocket. A search warrant was then *563 obtained for defendant’s residence. During that search, JPSO recovered the folio-wing: a box containing five 9 mm Tu-lAmmo Luger rounds from a drawer of a dresser located in the rear bedroom; a Taurus 9 mm magazine model 24/7 with a 15 round capacity on top of a dresser in the room to the right of the kitchen; a .380 auto cartridge in a container in that same room; and cell phones. The ammunition was the same brand and caliber as the shell casings found at the scene.
Defendant was brought to the detective bureau to Captain Dennis Thornton for interrogation. Defendant was advised of his rights via a waiver of rights form. After defendant initialed next to his rights and waived them, he gave three different statements. When the initial questioning started, defendant said in his first statement that he could not provide any information and that he was not present at the scene where the shooting occurred. Defendant then changed his story, admitted he lied, stated he was present at the scene, and agreed to give an audiotaped statement reflecting those changes.
In his first recorded statement dated July 26, 2013, at 6:06 P.M., defendant said he took Stephanie Taylor, his girlfriend, and their baby to the apartment complex in Harvey and brought them upstairs. Defendant walked downstairs, got into his vehicle, and saw a black Dodge Charger with tinted windows turning off from Manhattan. The Charger then pulled on the side of him, and a passenger dressed in black exited the vehicle, pulled a gun out from under his shirt, and fired multiple shots hitting his vehicle, a black Nissan. The Charger pulled off, and the passenger was still firing. Defendant stated that he did not carry a gun, he did not|fifire'a gim back at them to protect himself, and he never had a gun at all. He denied shooting at the other vehicle. Defendant also stated that when he returned to his house, he checked his car and it had bullet holes in the back by the trunk.
Defendant said that he did not call the police because he was scared since people were saying that the black Nissan did the shooting. He also said that he did not see a baby at the scene, just a man “standing out there,” who was “minding his own business.” The man “looked like he was doing something with somebody else or something.” After he arrived home, defendant’s girlfriend called and asked if he was alright because she heard the gunshots. Defendant stated that his girlfriend did not see anything because she was inside.
The police investigated defendant’s story in an attempt to corroborate defendant’s facts and officers were ordered to contact defendant’s girlfriend, Taylor. Captain Thornton testified that Taylor made several statements that were inconsistent with those made by defendant. As a result, he decided to question defendant again. Defendant admitted he had been untruthful about the black Dodge Charger and gave another statement.
In his second recorded statement dated July 26, 2013, at 9:11 P.M., defendant said that he brought his family upstairs and put his baby down on the stairs. He saw a man looking at him and “shaking his head just looking at me like this. Like he knew me from somewhere, but I don’t — , I never seen him before.” Defendant stated that the man made eye contact with him. Defendant went back to his vehicle and started to get in. The man then went to the passenger side of his vehicle and unlocked the door.[6] As defendant was getting in his car, he wondered why the man was unlock *564 ing his -door. The man came out of his vehicle with an 17AK-47, lifted it, and said, “What’s up now?,” after which defendant started firing shots.
Defendant stated that he had a 9 mm gun in his car under the seat and he did not take his gun out until the other man pulled out the AK-47, but did so because he feared for his life. He said that his daughter was right there by him and that his girlfriend was standing by the steps and she was scared. Defendant stated that he fired four or five times and the man fired three to six times. Defendant said he later saw on the news that a baby was shot, and Taylor called and told him that he shot a baby. Defendant stated he did not see a baby in the vehicle. He did not see the man put the baby in the car so he thought that the baby must have already been in the car. Defendant thought the man probably made a mistake and hit the baby.
Defendant explained he had a gun for protection because he was previously shot multiple times. He said he threw the gun out of the window when he was leaving the scene and he had no idea where it might be. He apologized and said he never meant to shoot a child.
Captain Thornton testified that there were no AK-47 casings or projectiles anywhere at the scene. Also, the officers did not find any strike marks or bullet holes on any of the houses or other cars in the area. Further, the officers did not find any evidence to show that defendant shot in self-defense. Captain Thornton testified that at this point in the investigation, an application for defendant’s arrest was drawn up and subsequently, an arrest warrant was issued.
Taylor testified that on July 25, 2013, she and defendant were at his residence. At some point, she, defendant, and their baby got into defendant’s mother’s car, a black Nissan Sentra, and defendant drove them to Taylor’s mother’s residence at 1000 Tensas Drive, Apartment C, in Harvey. When they arrived, Taylor exited the vehicle, and she and defendant talked. She was standing |sby the stairs not far from defendant, and defendant was on the driver’s side of the vehicle. Taylor then heard defendant say, “Do you know me?” to someone in the area; however, she could not see anyone. Defendant then grabbed a gun, told her to “step back,” pushed her back, and started shooting multiple times. She ran upstairs and Went inside the residence, and defendant drove away.
Taylor testified she could not see what the other person was doing or whether that person had a gun because she was on the “other side.” She testified that before defendant pulled out a gun and started shooting, no one shot at him first. She did not see anyone outside with a gun except for defendant and she did not see a black Dodge Charger drive up or a person dressed in black get out of a black Dodge Charger. She also testified the bullet holes in defendant’s black Nissan were there before this shooting. She testified that defendant’s vehicle was previously shot up.
Taylor testified that when she and defendant spoke on the phone later on, she told him a child was shot, and defendant replied that he did not see a child. Defendant told her that he knew there was someone else outside, but he didn’t know it was a child. During that phone conversation, defendant did not say anything about anyone pulling a gun on him or shooting at him, nor did he say anything to her about having recognized anyone or anything about self-defense. Taylor recounted an incident on August 7, 2011, wherein defendant was walking her home, and a group of men jumped out and shot defendant three *565 times.[7] She also recounted another incident on April 21, 2013, wherein a drive-by shooting liioccurred at defendant’s residence and multiple gunshots were fired at defendant’s house. She testified that she was present during both incidents.
Shantell Baham testified defendant was her son and he had lived with her his entire life. Ms. Baham testified that on April 21, 2013, approximately three months before this shooting, she was home alone that night in her house at 6144 Ray Street. At some point, she heard two car doors slam, after which she heard gunshots. Ms. Baham testified that it sounded like knocking on the door, but she knew it was not knocking because she could smell burnt residue from the sheetrock. She further testified that bullets came into her house and hit her vehicle, the black Nissan. Ms. Baham did not see who shot her house.[8]
DISCUSSION
In his first assignment of error, defendant argues his trial counsel was ineffective for not calling him as a witness at trial to show that he shot at Matthews in self-defense. He contends that Matthews was lying when he testified at trial that he did not know defendant. Defendant claims he and Matthews knew one another since Matthews and his friend were the individuals who had previously shot at defendant’s house. He further claims that on the day of the shooting in this case, Matthews threatened to kill him. Defendant contends this information was elicited from him at the hearing on the motion to reconsider sentence, but not at trial.
Generally, an ineffective assistance of counsel claim is more appropriately addressed through an application for post-conviction relief filed in the district court, where a full evidentiary hearing can be conducted, rather than by direct appeal. State v. Taylor, 04-346 (La.App. 5 Cir. 10/26/04), 887 So.2d 589, 595. However, when the record contains sufficient evidence to rule on the merits of the [ 10claim and the issue is properly raised in an assignment of error on appeal, it may be addressed in the interest of judicial economy. Id. Where the record does not contain sufficient evidence to fully explore a claim of ineffective assistance of counsel, the claim should be relegated to post-eon-viction proceedings. Id. We find the record is sufficient to review defendant’s ineffective assistance claim.
The Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution safeguard a defendant’s right to effective assistance of trial counsel. In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court held that a defendant asserting an ineffective assistance claim must show that defense counsel’s performance was deficient and the deficiency prejudiced the defendant.
*566 To establish ineffective assistance of counsel, the defendant has the burden of showing that “there is a reasonable probability that, but for counsel’s unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694,104 S.Ct. at 2068. It is unnecessary to address the issues of both counsel’s performance and prejudice to the defendant if the defendant makes an inadequate showing on either one of the components. State in the Interest of C.M., 13-128 (La.App. 5 Cir. 10/30/13), 128 So.3d 1118, 1131, writ denied, 13-2796 (La.5/30/14), 140 So.3d 1172.
In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-674 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
“The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83. The reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. Mitchell, 772 So.2d at 83; State v. Washington, 03-1135 (La.App. 5 Cir. 1/27/04), 866 So.2d 973, 977.
Defendant was convicted of attempted second degree murder.[9] Second degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1. Attempt is defined as “Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended.” La. R.S. 14:27 A. The crime of attempted murder requires proof of the specific intent to kill and the commission of an overt act tending toward the accomplishment of that goal. State v. Abdul, 11-863 (La.App. 5 Cir. 4/24/12), 94 So.3d 801, 810, writs denied, 12-1224, 12-1226 (La.10/12/12), 99 So.3d 41. Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). [^Because specific intent is a state of mind, it need not be proven as a fact, but may be inferred from the circumstances and actions of the accused. Id.
The doctrine of transferred intent provides that “When a person shoots at an intended victim with the specific intent to *567 kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing or inflicting of great bodily harm would have been unlawful against the intended victim actually intended to be shot, then it would be unlawful against the person actually shot, even though that person was not the intended victim.” State v. Strogen, 35,871 (La.App. 2 Cir. 4/3/02), 814 So.2d 725, 728, writ denied. 02-1513 (La.12/13/02), 831 So.2d 983.
A rational trier of fact could have found that the evidence showed that defendant had the specific intent to kill Matthews and that he committed an overt act in furtherance of that goal. Defendant’s specific intent to kill Matthews was transferred when he accidentally shot Matthews’ son. Defendant admitted that he pointed the gun at Matthews and fired at him multiple times. Specific intent to kill may be inferred from a defendant’s act of pointing a gun and firing at a person. State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, 585.
However, defendant argues that he acted in self-defense and that his actions were justifiable. He contends that his trial counsel was ineffective in failing to call him as a witness to testify regarding his self-defense claim.
It is defendant’s burden in a non-homicide case to prove by a preponderance of the evidence that his actions were in self-defense. State v. Nailor, 10-1062 (La.App. 5 Cir. 11/15/11), 78 So.3d 816, 821-22, writ denied, 11-2780 (La.4/27/12), 86 So.3d 626. The fact that an offender’s conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. La. R.S. 14:18. According to La. R.S. 14:20 A, a homicide is justifiable:
lis(l) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.
A person who is the aggressor or who brings on a difficulty cannot claim self-defense, unless he withdraws from the conflict in good faith. La. R.S. 14:21. In addition, while there is no unqualified duty to retreat, the possibility of escape from an altercation is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger. State v. Theriot, 07-71 (La.App. 5 Cir. 6/26/07), 963 So.2d 1012, 1020, writ denied, 07-1598 (La.2/1/08),' 976 So.2d 715.
The determination of a defendant’s culpability rests on a two-fold test: (1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger; and (2) whether deadly force was necessary to prevent the danger. Theriot 963 So.2d at 1020. The jury is the ultimate fact-finder in determining whether a defendant proved his condition. Id.
There was evidence introduced at trial that showed defendant shot at Matthews in self-defense. In his second recorded statement, defendant said that he and the man (later identified as Matthews) made eye contact and Matthews shook his head, *568 after which Matthews walked to the passenger side of his vehicle, unlocked the door, and came out of the vehicle with an AK-47. He claimed Matthews said, “What’s up now?” and fired three to six times. Defendant stated he started firing shots because he feared for his life and that of his daughter and 114girlfriend who were nearby. The evidence at trial also indicated that defendant was afraid as he had been shot previously, and his house had been shot three months earlier in a drive-by shooting.
On the other hand, the State presented evidence to negate defendant’s claim of self-defense. Captain Thornton testified that there was no ballistic material recovered from the scene consistent with an AK-47 having been fired at the scene. Also, defendant’s girlfriend, Taylor, testified defendant pulled out a gun, started shooting, and no one shot at him first. She testified that from where she was standing, she did not see anyone outside with a gun, except for defendant. Taylor also testified that the bullet holes in defendant’s vehicle were there before this shooting. When she and defendant talked after the shooting, defendant did not say anything to her about someone pulling a gun on him or shooting at him nor did he say anything about recognizing the shooter or having to defend himself. Additionally, Elizabeth King, a witness who qualified as an expert firearms and tool marks examiner, testified the evidence she looked at and the analysis she conducted was consistent with there being only one firearm used.
After hearing the testimony, the jury obviously believed the State’s witnesses and rejected defendant’s claim that he shot at Matthews in self-defense. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052,1056.
A rational trier of fact could have found that the evidence was sufficient under the Jackson standard to support defendant’s convictions and that defendant failed to establish by a preponderance of the evidence that he acted in self-defense in shooting at Matthews. The trier of fact could also have found based on the 11firecord, that defendant was fearful of being shot again, but that he nevertheless overreacted when Matthews unlocked the rear passenger side door of his vehicle and opened it. Defendant apparently thought Matthews was going to retrieve a weapon from the vehicle, when in fact, he only intended to unbuckle his daughter from her car seat.
Defendant argues that his counsel was ineffective for failing to call him as a witness to support his self-defense claim. He claims that the fourth version of the facts, as set forth at the hearing on defendant’s motion to reconsider sentence is the correct version, and that counsel was ineffective for failing to have defendant testify at trial regarding the correct facts supporting his claim of self-defense.[10]
*569 Presumably, defendant would have testified at trial as he did at the hearing on the motion to reconsider sentence: that he knew Matthews from a gang and that Matthews and his friend had previously shot defendant three times and shot defendant’s house in a drive-by shooting; that Matthews pulled up in a car, got out, and he and defendant confronted one another; Matthews told defendant, “You remember the last time we shot you. Now this time we’ll kill you.” Then Matthews walked to his car and grabbed his firearm and defendant did the same, and they started shooting at each other.
11 (¡After reviewing the foregoing, we cannot say that defense counsel was ineffective in declining to call defendant as a witness. We find that defense counsel’s performance was not deficient. First, defendant would have had very little credibility had he testified to a fourth version of events. Second, defense counsel was able to raise a self-defense claim through defendant’s statements without defendant’s testimony. Defense counsel was also able to show, through the testimony of defendant’s mother, that defendant had reason to be fearful of being shot because of the drive-by shooting at her home three months prior. Additionally, defense counsel argued self-defense during his closing argument, and the court instructed the jury on self-defense. Third, even if defendant had testified, his testimony would have been contradicted with testimony indicating that only one gun was used at the scene, that there was no gun in Matthews’ vehicle when it was searched after the shooting, no one reported seeing Matthews throw a gun from his vehicle on the way to the hospital, and no one reported finding an AK-47 on the ground.
Defense counsel presumably chose not to call defendant as a witness as part of his trial strategy. An alleged error that falls within the ambit of trial strategy does not establish ineffective assistance of counsel because “opinions may differ on the advisability of such a tactic.” State v. Brooks, 505 So.2d 714, 724 (La.1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987) (citing Strickland v. Washington, supra). Therefore, “hindsight is not the proper perspective for judging the competence of counsel’s trial decisions. Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” Id. (citing Strickland v. Washington, supra). If an alleged error is part of counsel’s trial strategy, it does not establish ineffective assistance of counsel. State v. Esteen, 02-1241 (La.App. 5 Cir. 4/29/03), 846 So.2d 167, 174, writ denied, 03-1486 (La.1/9/04), 862 So.2d 978. Thus, we find defense counsel was not ineffective for declining to call defendant as a witness at trial.
*570 In his second assignment of error, defendant argues that his fifty-year maximum sentence for an attempted second degree murder conviction (count one), his concurrent twenty-year sentence for an illegal use of a weapon while committing a crime of violence conviction (count two), and his consecutive ten-year sentence for an illegal use of a weapon conviction while committing a crime of violence (count three), for a total of sixty years, is constitutionally excessive, considering he is a first time offender, the money needed to keep him in prison could be better spent on other things, and the sentences are nothing more than the needless infliction of pain and suffering with no rehabilitative effects. He also contends that the sentences are excessive, considering he was in fear and shooting in self-defense, and he was unaware there was a child in the back seat and thus, he had no intent to injure the child. Defendant asserts he should not have received maximum sentences on counts one and two as he is not the worst type of offender.
Defendant was convicted of attempted second degree murder (count one) which has a sentencing range of not less than ten nor more than fifty years. See La. R.S. 14:30.1; La. R.S. 14:27. He was also convicted of two counts of illegal use of a weapon while committing a crime of violence which has a sentencing range of not less than ten nor more than twenty years (counts two and three). See La. R.S. 14:94 F.
At the sentencing hearing, the trial judge stated he had considered the sentencing guidelines, testimony and facts presented at trial, and found “for no apparent reason” defendant pulled out a 9 mm pistol and fired four rounds at Matthews as he was taking out his two small children from a vehicle. The trial judge said that thankfully defendant did not kill anybody; however, one of the |18bullets penetrated the vehicle and struck the two-year-old boy in the face. He also stated that although the boy lost a tooth, he would be scarred for the rest of his life. He found that defendant was in need of correctional treatment and that any lesser sentence would deprecate the seriousness of defendant’s crime. The court considered that defendant had discharged a firearm during a crime of violence, shot a two-year-old in the face, and could have killed the four-month-old child[11] or his intended target, Matthews, or anyone in the neighborhood.
The trial judge found that this was an “extremely, obviously serious offense.” After providing reasons, defendant was sentenced to imprisonment at hard labor for fifty years on count one, a concurrent twenty-year sentence on count two, and a consecutive ten-year sentence on count three, for a total of sixty years. Defense counsel objected to the excessiveness of the sentences.
Defendant filed a timely motion for reconsideration of sentences under La. C.CrJP. art. 881.1, making the same basic arguments he makes on appeal. At the hearing on the motion for reconsideration of sentence, defendant testified he knew Matthews from a gang, and Matthews and his friend had previously shot him three times and shot his house in a drive-by shooting. Defendant also testified Matthews pulled up in a car, and he and defendant made eye contact. After a confrontation, Matthews told him, “You remember the last time we shot you. Now this time we’ll kill you.” Defendant explained that Matthews then walked to his car and grabbed his firearm from underneath the driver’s seat, and he did the *571 same, after which they started shooting at each other. Defendant stated that he had a gun to protect himself and that he had never shot a gun before the instant shooting. He testified that he could not see any children inside of Matthews’ car. Defendant further testified that as Matthews approached, he was in fear for his life.
1 ^Following defendant’s testimony, defense counsel argued that the sentences were excessive, and he asked the trial judge to reconsider and lower them and to make them all concurrent. The trial judge denied the motion for reconsideration. He noted that defendant shot four times at an adult male while he was dropping off his two young children. The trial judge stated that the maximum sentence he could have imposed was ninety years and that the sentences imposed totaled sixty years, thirty years less than they could have been. He found that the attempted murder of another human being while endangering the lives of two young children was a “heinous crime,” noting that the child was struck in the face. He also noted defendant had “absolutely zero credibility with this Court,” and that his story changed every time.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Smith, 01-2574 (La.1/14/03), 839 So.2d 1, 4. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. Id. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Lawson, 04-334 (La.App. 5 Cir. 9/28/04), 885 So.2d 618, 622, writ denied. 05-244 (La.12/9/05), 916 So.2d 1048.
A trial judge has broad discretion when imposing a sentence, and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. State v. Dorsey, 07-67 (La.App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130, writ denied, 08-1649 (La.4/17/09), 6 So.3d 786. The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. State v. Pearson, 07-332 (La.App. 5 Cir. 12/27/07), 975 So.2d 646, 656. In reviewing a trial court’s sentencing discretion, three factors are considered: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts. Id. Generally, maximum sentences are reserved for cases involving the most serious violations of the offense charged and the worst type of offender. State v. Badeaux, 01-406 (La.App. 5 .Cir. 9/25/01), 798 So.2d 234, 239, writ denied, 01-2965 (La.10/14/02), 827 So.2d 414.
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La.C.Cr.P. art. 883. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently. Id.
A trial judge retains discretion to impose consecutive sentences on the basis of factors such as the offender’s past criminal acts, the violent nature of the charged offenses, or the risk that the defendant may pose to the safety of the *572 community. State v. Miller, 11-498 (La.App. 5 Cir. 12/13/11), 84 So.3d 611, 620, writ denied, 12-176 (La.9/14/12), 97 So.3d 1012. If the trial court elects to impose consecutive sentences for crimes arising from a single course of conduct, it must articulate the reasons it feels the sentence is necessary. Id. at 620-621. Although the imposition of consecutive sentences requires particular justification when the crimes arise from a single course of conduct, consecutive sentences are not necessarily excessive. Id. at 621. The failure to articulate specific reasons for consecutive sentences does not require remand if the record provides an adequate |21factual basis to support consecutive sentences. See State v. Blanchard, 03-612 (La.App. 5 Cir. 11/12/03), 861 So.2d 657, 664, writ denied, 03-3389 (La.10/15/04), 883 So.2d 1045.
Defendant’s fifty-year sentence for his attempted second degree murder conviction was the maximum sentence he could have received. This Court has upheld similar sentences for similarly situated defendants. See State v. Hughes, 14-487, 165 So.3d 978 (La.App. 5 Cir. 11/25/14) (where this Court upheld the defendant’s fifty-year sentence for attempted second degree murder, noting the defendant opened fire from approximately two to three feet away into a vehicle while standing in a neighborhood street, shooting at the victim as he attempted to flee and firing multiple shots that endangered the lives of others; also, the victim sustained three gunshot wounds); State v. Stacker, 02-768 (La.App. 5 Cir. 12/30/02), 836 So.2d 601, writ denied, 03-411 (La.10/10/03), 855 So.2d 327 (where this Court found that the defendant’s fifty-year sentence for attempted second degree mürder was not excessive, noting a firearm was used to shoot a victim at relatively close range and the defendant pursued the victim as the victim attempted to flee, firing two more shots with children present).
With respect to counts two and three, illegal use of a weapon while committing a crime of violence, defendant was sentenced to twenty years and ten years, respectively. Twenty years was the maximum sentence he could have received, and ten years was the minimum sentence he could have received. See La. R.S. 14:94 F. Courts have upheld similar sentences for similarly situated defendants. See State v. Ates, 43,327 (La.App. 2 Cir. 8/13/08), 989 So.2d 259, writ denied, 08-2341 (La.5/15/09), 8 So.3d 581 (where the appellate court found a sixteen-year sentence was not excessive for a defendant who fired a rifle át a vehicle he thought was driven by a minor child whom his wife had an affair with, [ganoting he committed the crime in front of his own children, expressed no remorse until his sentencing hearing, and his actions could have resulted in death or injury to a bystander); State v. Brazil, 34,341 (La.App. 2 Cir. 4/4/01), 784 So.2d 734 (where the appellate court found a ten-year sentence was not excessive for a defendant who fired a shotgun into a crowd assembled at a park, noting the trial court found the offense was serious and defendant’s actions created the danger of injury for innocent bystanders); State v. Windsor, 14-146, 2014 WL 2019253 at *3, 2014 La.App. Unpub. LEXIS 311 at *8 (La.App. 4 Cir. 5/14/14)[12] (where the appellate court found a twenty-year sentence was not excessive for a defendant who attempted to rob the victim at gunpoint and exchanged gunfire with the victim, noting the victim was wounded and *573 the defendant was previously incarcerated for attempted armed robbery).
The sentences imposed were not excessive and the trial judge did not err by ordering the sentence on count three to run consecutively to the sentences on counts one and two. The circumstances of this case were very serious. Defendant pulled out a gun while standing in a neighborhood street and fired multiple shots at Matthews. One of the bullets struck Matthews’ two-year-old son in the face and endangered Matthews’ infant daughter. There is no evidence Matthews had a gun or that he and defendant even knew each other. The record supports the sentences imposed. Further, the trial judge found that defendant was in need of correctional treatment and any lesser sentence would deprecate the seriousness of defendant’s crime. Additionally, courts have upheld similar sentences for similarly situated defendants.
Lain his third assignment of error, defendant argues his convictions were based on the perjured testimony of Matthews. He contends Matthews perjured himself when he testified he was shot by a person he did not know and who had no reason for shooting at him.
There is no evidence in the record that Matthews lied when he testified he did not know the shooter and had never seen him before. In fact, in defendant’s second recorded statement that was introduced into evidence, defendant said he did not know the man and had never seen him before. As was stated previously, the jury obviously believed the State’s witnesses and rejected the theory that defendant shot at Matthews in self-defense. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. Rowan, supra.
ERROR PATENT
The record was reviewed for errors patent, according to the mandates of La. C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Welland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review reveals one error patent.
The State of Louisiana Uniform Commitment Order reflects the date of adjudication was March 6, 2014; however, the record reflects the date of adjudication was February 26, 2014. Therefore, we remand this case and order the Uniform Commitment Order be corrected to reflect the correct date of adjudication. We also direct the Clerk of Court for the Twenty-Fourth Judicial District Court to transmit the original of the corrected Uniform Commitment Order to the officer in charge of the institution to which defendant has been sentenced and to the Department of Corrections’ legal department. See State v. Long, 12-1184,⅞4 (La.App. 5 Cir. 12/11/12), 106 So.3d 1136,1142 (citing La.C.Cr.P. art. 892B(2)). We further order that a copy of this opinion be provided to the Clerk of Court for the Twenty-Fourth Judicial District Court.
CONCLUSION
For the reasons stated above, defendant’s convictions and sentences are affirmed, and this case is remanded for correction of the commitment.
CONVICTIONS AND SENTENCES AFFIRMED; REMANDED FOR CORRECTION OF COMMITMENT.

. At sentencing, the trial court refers to the little girl being four months old.

. Matthews testified that he could not cover both children, and decided to cover his younger daughter.

. Deputy Sabrina Howard of the Jefferson Parish Sheriff’s Office ("JPSO”) testified that on July 25, 2013, she was dispatched to 1050 Manhattan in response to illegal gunfire in the area. The shots were close to where the shooting in this case occurred. She received additional information that a black male in a silver Ford Focus was travelling at a high rate of speed on Tensas Drive. It was later determined that the black male was Matthews who was taking his son to the hospital.

. Matthews also testified he had prior convictions for purse snatching, burglary of a residence, misdemeanor "carnal knowledge,” and misdemeanor “resisting.” He further testified that he was currently in jail on the purse snatching conviction.

.Elizabeth King of JPSO, an expert firearms and tool marks examiner, testified that the four fired cartridge cases were fired from the same unknown firearm, but not by the 9 mm Bryco pistol recovered from Joshua Hawkins. She testified one weapon fired the four spent casings and one weapon fired the two recovered projectiles; however, she could not link the casings and the projectiles because she did not have the firearm. King testified that a Taurus could have fired the projectiles. She also testified that the evidence she looked at and the analysis she conducted were consistent with there being one firearm used in this case. She further testified she was familiar with AK-47 rounds and weapons and there is no way to confuse a 9 mm round with an AK-47 round.

. Defendant stated that the man had a "blue” "little wagon car,” like a station wagon.

. The State and the defense stipulated that on August 7, 2011, Deputy Wayne Aguillard responded to a report of gunshots at defendant’s residence. When Deputy Aguillard arrived, he learned that a fight had broken out between defendant and another individual, defendant had been shot three times, and defendant also reported several unknown black males approached him as he was shot. The State and the defense further stipulated that Brendel Dorsey was arrested in connection with that shooting, the district attorney’s office never filed charges against Dorsey, and none of the additional aggressors were identified.

. Deputy Clinton Williams testified that he responded to the call on April 21, 2013, regarding gunshots being fired, after which he found shell casings on the road in front of the house at 6144 Ray Street, a total of twenty-four 7.62 rounds which were consistent with an AK-47.

. He was also convicted of two counts of illegal use of a weapon while committing a crime of violence in violation of La. R.S. 14:94 F. "Illegal use of weapons or dangerous instrumentalities is the intentional or criminally negligent discharging of any firearm, ... where it is foreseeable that it may result in death or great bodily harm to a human being.” La. R.S. 14:94 A.

. At the motion to reconsider sentence, defendant testified he knew Matthews from the past, i.e., from a gang. On August 7, 2011, defendant got into a fight with Matthews and his friend, Brendel Dorsey, and they shot him. Matthews and his gang were also responsible for shooting up his house in 2013. Defendant .testified he had a gun prior to this incident and he had one in this incident because he was protecting himself since he was previously shot. Defendant testified he brought his girlfriend and baby home, helped them bring the bags upstairs, came back downstairs, saw Matthews pulling up in car, and made eye contact. Then, Matthews walked to the fence and they got into an argument. Matthews *569 told defendant, “You remember the last time we shot you. Now this time we’ll kill you.” Defendant testified Matthews walked back to his car and grabbed his firearm, defendant grabbed his firearm at the same time and started starting shooting. Matthews started shooting also. Defendant testified he could not state what kind of gun Matthews had at the time, "I just seen the gun that was in his hand.” Defendant testified that he could not see any children in the car. Defendant also testified that Matthews reached for his gun from the driver's seat. He further testified that he never shot a gun before this incident and he only shot the gun in this incident because he feared for his life.
On cross-examination, defendant admitted that this was his fourth version of the events that happened that day. Defendant testified that Matthews attacked him because they were in rival gangs. He also admitted that.he lied tire three times prior to this statement, but this fourth version was the truth. Defendant further conceded that he lied at the bond hearing, wherein he told the trial judge that he had never owned or possessed a firearm.

. Matthews referred to his little girl earlier as being five months old.

. This case is published on the fourth circuit’s website and may be cited as authority despite not being designated for publication. See State in the Interest of S.L., 11-883 (La.App. 5 Cir. 4/24/12), 94 So.3d 822, 827 n. 2; La. C.C.P. art. 2168.