STATE OF LOUISIANA

VERSUS

ALCUS A. SMITH
A.K.A. "BUG" A.K.A. "BULL"

NO. 20-KA-177

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 16-951, DIVISION "M"
HONORABLE RAYMOND C. BIGELOW, JUDGE PRO-TEMPORE


April 28, 2021


**JOHN J. MOLAISON, JR.**
**JUDGE**


Panel composed of Judges Susan M. Chehardy,
Robert A. Chaisson, and John J. Molaison, Jr.


**REMANDED WITH INSTRUCTIONS**
    **JJM**
    **SMC**
    **RAC**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
        Honorable Paul D. Connick, Jr.
        Thomas J. Butler
        Gail D. Schlosser
        Douglas W. Freese
        Seth W. Shute

COUNSEL FOR DEFENDANT/APPELLANT,
ALCUS A. SMITH A.K.A. "BUG" A.K.A. "BULL"
        Jane L. Beebe

**MOLAISON, J.**

The defendant, Alcus Smith, appeals his conviction for second-degree murder. For the following reasons, we remand the matter to the trial court with instructions for further proceedings.

## PROCEDURAL HISTORY

The defendant was indicted for the second-degree murder of Donte Hall, in violation of La. R.S. 14:30.1, by a Jefferson Parish Grand Jury on February 25, 2016. After pleading not guilty and filing pre-trial motions,[1] and following a mistrial, the defendant ultimately proceeded to a second jury trial, during which he was found guilty as charged on October 31, 2019. The defendant's motion for new trial and motion for post-verdict judgment of acquittal were both denied on December 2, 2019, and the defendant received a life sentence to be served concurrently with a previously imposed 60-year sentence. The instant timely appeal follows.

## FACTS

Derenne Carter testified at trial that he knew Donte Hall, the victim in this case, and was present when Mr. Hall was killed. Mr. Carter further testified that before Mr. Hall's death, he participated in a drug trafficking business with the defendant, Alcus Smith, and other individuals. He explained that before Mr. Hall's death, the defendant told him that he wanted to kill Mr. Hall because he believed that Mr. Hall had set him up to be robbed during a drug deal. Mr. Carter asserted that on the night of Mr. Hall's shooting, the defendant picked him up in a dark-colored vehicle and told him about the plan to kill Mr. Hall. The defendant then drove them to Mr. Hall's house and Mr. Hall got in the front seat. Mr. Carter testified that Errol Brower and Richard Lee, who were friends of his, were

---

[1] On April 2, 2019, the defendant filed a Motion to Declare Article 782(A) Unconstitutional Because It Allows For A Non-Unanimous Verdict that was denied on April 23, 2019.

20-KA-177                                    1

involved in the plan to kill Mr. Hall and were following nearby in a light-colored vehicle at that time.

Mr. Carter recalled that after the defendant picked up Mr. Hall, the light-colored vehicle followed them and passed them "along the way." He testified that they eventually drove into an unfamiliar neighborhood and the defendant told Mr. Hall they were going to pick up some guns. Mr. Carter testified that they stopped, after which the defendant, Mr. Hall, Mr. Brower, and Mr. Lee exited their respective vehicles. The three men then fired their guns at Mr. Hall, killing him. Mr. Carter testified that he did not know what happened to the guns used to shoot Mr. Hall, and he did not contact the police after the incident. Mr. Carter explained that he and Mr. Hall were unarmed, but that defendant had a gun, which Mr. Carter observed in the defendant's lap when he first got into the defendant's vehicle. He recalled that when Mr. Hall got into the vehicle, the defendant put his gun into his hoodie pocket.

Mr. Carter testified that he faced charges of racketeering and conspiracy to distribute cocaine and had entered into a plea agreement that required him to provide truthful testimony regarding anyone he was in business with, including the defendant.

Leroy Bird testified that Mr. Hall was his "partner" and good friend and that he knew the defendant because he had purchased drugs from him before. Mr. Bird testified that on the day Mr. Hall was killed, but before the murder, at approximately 6:30 or 7:00 p.m., Mr. Hall called[2] and told him about a drug deal that "went bad" the day before outside Mr. Hall's house and that the defendant thought Mr. Hall had something to do with it. Mr. Bird further testified that the

---

[2] When shown phone records, which indicated that a call was made between Mr. Hall's phone and Mr. Bird's phone at 6:33 p.m. for approximately two minutes, Mr. Bird testified that matched his recollection of the phone call between him and Mr. Hall.

defendant was going to pick Mr. Hall up and that he wanted Mr. Bird to know his whereabouts.

Mr. Bird indicated that Mr. Hall was not behind the robbery of the defendant. He testified that he was concerned for Mr. Hall's safety and that he told Mr. Hall not to go with the defendant and to wait until he got there. After the phone call, Mr. Bird learned that Mr. Hall had been killed.

Nathan Carter testified that he engaged in narcotics trafficking with the defendant and other individuals. Mr. Carter asserted that he became aware of Mr. Hall's murder after it occurred. He recalled a conversation where the defendant told him that he had been "ripped off" in a drug deal and was angry about it. Mr. Carter testified that the defendant told him Mr. Hall had set him up to get robbed of some money or drugs. He also testified that the defendant told him he was going to get Mr. Hall back. Mr. Carter explained that he told the defendant that he should let it go because he thought it might interfere with their drug business. He testified that the defendant called him later and told him he "took care of things" and that it was "done." Mr. Carter said he did not know at the time that Mr. Hall had been killed. He asserted that he told the defendant to "lay low" but that the defendant did not seem concerned about it because he believed nobody would know what happened.

Marshanda Jackson testified that she knew Mr. Hall all of his life because his great-grandmother and her grandmother were very close friends. She stated that Mr. Hall's grandmother lived next door to her and that Mr. Hall spent a lot of time there. Ms. Jackson testified that she knew the defendant from coming by Mr. Hall's house. She recalled that the defendant came over the night before Mr. Hall was killed and spoke to Mr. Hall. Ms. Jackson stated that she was on the porch when the defendant drove up in a black Infiniti, which he normally drove. Ms.

Jackson asserted that when the defendant pulled up, Mr. Hall got into the vehicle for seven to ten minutes and then got out and left.

Ms. Jackson testified that the next day, on November 16, 2013, she and her daughter, Mya Jackson, were at Ms. Jackson's grandmother's house. She recalled that Mya and Mr. Hall were outside playing football. Ms. Jackson testified that she saw the defendant pull up at approximately 2:00 or 3:00 p.m., after which she went inside. Ms. Jackson asserted that Mya came inside at one point and spoke to her about something she had seen outside. Ms. Jackson later viewed a photographic lineup and positively identified the defendant.

Mya Jackson testified that Mr. Hall and the defendant were friends and that she knew Mr. Hall, as they stayed next door to each other. She stated that the defendant and Mr. Hall had been "associated" for a couple of months and that the defendant would go to Mr. Hall's house in his black Infiniti, which had tinted windows and bright neon blue headlights. She found out Mr. Hall was killed on November 16, 2013. Ms. Jackson testified that the last time she saw Mr. Hall was that day when they were outside playing football. Ms. Jackson recalled that the defendant arrived at the house, after which Mr. Hall went inside, retrieved his jacket, came back outside, got into the front passenger seat of the defendant's vehicle, and left. She stated that when Mr. Hall got into the vehicle, she saw the driver in the vehicle but nobody else; however, she was not looking for other occupants in the car at that time. Ms. Jackson testified that when the defendant pulled off, she noticed a white vehicle speed off in the same direction as the defendant's vehicle. She asserted that they were headed in the direction of the Westbank Expressway toward the tunnel. Ms. Jackson stated that she went inside and told her mother because she thought it was "kind of funny" how the white vehicle was following the defendant's vehicle. She testified that after she found

out that night that Mr. Hall had been killed, she spoke to a detective. Ms. Jackson said she was shown a photographic lineup and positively identified the defendant.

Sergeant Travis Eserman of the Jefferson Parish Sheriff's Office ("JPSO") testified that he was the case officer in Mr. Hall's murder case, and that he went to the crime scene after a 9-1-1 call was made reporting the shooting. Sergeant Eserman further testified that when he arrived, he observed casings on the ground and the victim, noting that the shooting occurred on the street. He asserted that the neighborhood where the incident happened was off of Lafitte-LaRose, on a very isolated street.

Sergeant Eserman noted that the murder weapons and the victim's phone were not recovered. He stated that investigators retrieved security camera footage from neighboring houses, parts of which were shown to the jury. Sergeant Eserman explained that the videos showed dark and light-colored vehicles coming into the neighborhood just before 7:00 p.m., on November 16, 2013, and then leaving afterward. He said the video footage also showed the dark and light-colored vehicles backing out of the location where the victim was later found in the street.

Sergeant Eserman testified that he obtained phone records for the phones belonging to the defendant, Mr. Hall, and Mr. Bird because he became aware of communications between the defendant and Mr. Hall, and between Mr. Bird and Mr. Hall. He learned that Mr. Hall called Mr. Bird approximately 27 minutes before he was killed and that the call lasted 121 seconds. Sergeant Eserman also learned that there were more than 50 communications between Mr. Hall and the defendant between November 14 and 16. He stated that the last time anyone used the phone the defendant had on November 16, 2013, was approximately 47 minutes after Mr. Hall was killed. Sergeant Eserman asserted that there was a 40-second call at 6:26 p.m. on the night of the murder from the defendant to Mr.

Carter, which was consistent with the information he received from Mr. Carter. He said that he also obtained images from Facebook and Instagram that connected the defendant to a black Infiniti-type of vehicle.

Dr. Yen Van Vo testified that she was a forensic pathologist employed by the Jefferson Parish Coroner's Office, and was accepted by the court as an expert in the field of forensic pathology. Dr. Vo testified that she was qualified to review the work of other pathologists. She further testified that she was able to formulate her conclusions regarding the cause and manner of death in the instant case even though she did not perform the autopsy of Mr. Hall herself. Dr. Vo asserted that Dr. Dana Troxclair, the chief of pathology, performed Mr. Hall's autopsy and that she reviewed Dr. Troxclair's autopsy report and photographs.

Dr. Vo testified that Mr. Hall's cause of death was multiple gunshot wounds and that the manner of death was a homicide. She explained that three wounds would have inflicted the most severe injuries and had the greatest probability of being fatal: 1) an entrance wound on the right side of the head with an exit wound on the left side of the head, 2) an entrance wound on the right side of the face with a bullet lodged in the tongue, and 3) an entrance wound on the right side of the abdomen with a bullet lodged in the left side of the back. She stated that the range of distance of the gunshot wounds would be a combination of distant and indeterminate and that everything beyond 12 inches was considered distant. Dr. Vo noted that if there were three shooters, she could not say which wounds were caused by which shooter.

Jene Rauch testified that she worked for the JPSO crime lab as the supervisor of the firearm and tool mark section, and as a bloodstain pattern analyst. The State and the defense stipulated that she was an expert in the fields of firearms examination, shooting incident reconstruction, and crime scene investigation. She noted that the weapons used in the instant case were not recovered, which she

explained was not uncommon. Ms. Rauch testified that she received evidence from the autopsy. She concluded that the cartridge casings found at the scene were fired from three separate weapons. She further concluded that one casing was fired from a 9 mm weapon, four casings were fired from a .40 caliber weapon, and one casing was fired from a different .40 caliber weapon. Ms. Rauch also testified that there was evidence of at least three different guns firing projectiles at the scene. She stated that .38 caliber class projectiles were recovered that were consistent with a 9 mm weapon and that .40 caliber class projectiles were recovered that were consistent with .40 caliber Smith and Wesson pistols. Ms. Rauch explained that revolvers could have been used since they do not eject casings and that casings could be missing because they bounced or were displaced by EMS or police.

The defense rested without calling any witnesses.

## LAW AND ANALYSIS

In his first assignment of error, the defendant contends that the trial court erred in denying his motion for post-verdict judgment of acquittal because the state failed to prove his identity as the shooter beyond a reasonable doubt. As will be discussed more fully below, our discovery of an error patent regarding unanimous jury concurrence requires us to remand the matter for further proceedings. However, we must first consider the sufficiency of the evidence, as this determination could result in the jury's concurrence in the verdict being unnecessary to ascertain. *State v. Raymo*, 419 So.2d 858, 861 (La. 1982); *State v. Chinchilla*, 20-60 (La. App. 5 Cir. 12/23/20), 307 So.3d 1189.

In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct, circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d

560 (1979); *State v. Baham*, 14-653 (La. App. 5 Cir. 3/11/15), 169 So.3d 558, 566, *writ denied*, 15-40 (La. 3/24/16), 190 So.3d 1189. When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 provides, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational trier of fact could not have found proof of guilt beyond a reasonable doubt. *Baham*, 169 So.3d at 566.

It is not the function of the appellate court to assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442, 443. The trier of fact shall evaluate credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. *State v. Bradley*, 03-384 (La. App. 5 Cir. 9/16/03), 858 So.2d 80, 84, *writs denied*, 03-2745 (La. 2/13/04), 867 So.2d 688 and 08-1951 (La. 1/30/09), 999 So.2d 750.

In the present case, the defendant was convicted of one count of second-degree murder. In challenging the sufficiency of the evidence, the defendant does not contest the sufficiency of the essential statutory elements; rather, he challenges his identity as the perpetrator and asserts that the State failed to negate any reasonable probability of misidentification.

Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. Where the key issue is the identification, the State is required to negate any reasonable probability of misidentification to carry its burden of proof. *State v. Ray*, 12-684 (La. App. 5 Cir. 4/10/13), 115 So.3d 17, 20, *writ denied*, 13-1115 (La. 10/25/13), 124 So.3d 1096. Identification by only one witness is sufficient to support a conviction. *State v.*

*Williams*, 08-272 (La. App. 5 Cir. 12/16/08), 3 So.3d 526, 529, *writ denied*, 09-0143 (La. 10/16/09), 19 So.3d 470. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a requisite factual finding. *State v. Caffrey*, 08-717 (La. App. 5 Cir. 5/12/09), 15 So.3d 198, 202, *writ denied*, 09-1305 (La. 2/5/10), 27 So.3d 297.

In *State v. Cowart*, 01-1178 (La. App. 5 Cir. 3/26/02), 815 So.2d 275, 284-85, *writ denied*, 02-1457 (La. 5/9/03), 843 So.2d 387, there was no physical evidence linking the defendant to the crime, and a single witness identified the defendant as the perpetrator of a shooting. At trial, the reliability of the eyewitness was attacked because the witness was a convicted felon, had been under psychiatric care, had initially lied to the police, gave a description that did not match the defendant, had perjured herself during motion hearings, and had changed her story about the crime scene and the number of shots she heard. Despite this long list of deficiencies, this Court held that it was within the jury's discretion to believe the witness's testimony.

Upon review, we find that the State presented sufficient evidence to negate any reasonable probability of misidentification of the defendant. Mr. Carter testified that he was inside the vehicle and observed the defendant and the other two individuals shoot and kill Mr. Hall. Ballistic evidence confirmed that three weapons were used at the scene. Mya testified that she observed Mr. Hall get into the vehicle with the defendant shortly before the murder. Mr. Carter testified that the defendant wanted to retaliate against Mr. Hall. The surveillance video showed a dark-colored vehicle and a light-colored vehicle, which matched the descriptions of the vehicles of the defendant and the other two individuals, pull into the neighborhood and then leave shortly after the murder. Phone records confirmed pertinent conversations between Mr. Hall and Mr. Bird and between the defendant

20-KA-177                    9

and Mr. Carter shortly before the murder. Additionally, the evidence showed that the defendant had the specific intent to kill when he and the other individuals pointed their guns and fired them at Mr. Hall, thereby causing Mr. Hall to sustain nine gunshot wounds and killing him.[3]

In light of the foregoing, we find that a rational trier of fact could have found that the evidence was sufficient under the *Jackson* standard to support the defendant's second-degree murder conviction. Having found that the evidence presented was sufficient to convict the defendant of second-degree murder, we next address an error patent on the face of the record, which requires a remand to the trial court for further proceedings.

## ERROR PATENT REVIEW

*Unanimous Jury Verdict*

In the instant case, the defendant was indicted for second-degree murder in violation of La. R.S. 14:30.1, which requires that the sentence be served at hard labor. Since the punishment for the offense is necessarily confinement at hard labor, a jury of twelve persons was required. *See* La. Const. Arts I, § 17; La. C.Cr.P. art. 782. Non-unanimous verdicts were previously allowed under these provisions and based on the circumstances of the instant case. *State v. Bertrand*, 08-2215 and 08-2311 (La. 3/17/09), 6 So.3d 738, and *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972).

However, in *Ramos v. Louisiana*, 590 U.S. - - , 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020), the United States Supreme Court found that the Sixth Amendment right to a jury trial—as incorporated against the states by the Fourteenth Amendment—requires a unanimous verdict to convict a defendant of a serious offense. For purposes of the Sixth Amendment, federal law defines serious

---

[3] It is well established that specific intent may be inferred from the act of pointing a gun and firing at a person. *State v. Hidalgo*, 95-319 (La. App. 5 Cir. 1/17/96), 668 So.2d 1188, 1197.

offenses as offenses subject to imprisonment over six months. Accordingly, Louisiana defendants who have been convicted of serious offenses by non-unanimous juries and whose cases are still pending on direct review are entitled to new trials. *See, State v. Kelly*, 19-425 (La. App. 5 Cir. 7/31/20), 299 So.3d 1284; *State v. Rivas*, 19-378 (La. App. 5 Cir. 5/21/20), 296 So.3d 1198.

In the instant case, the concurrence of the jury verdict appears unclear based on the record. The transcript reflects that when the jury returned to the courtroom following deliberations, the jury foreman indicated that the defendant was found guilty as charged. Defense counsel requested polling of the jury,[4] after which a bench conference was held. Both the transcript and the minute entry indicate that the trial judge declared a unanimous verdict.

Our review of the polling slips indicates that while eleven (11) jurors circled "YES" next to "Guilty as Charged," thereby indicating their respective verdicts were that the defendant was guilty as charged of the second-degree murder of Donte Hall, one (1) of the jurors circled "YES" next to all three options on the polling slip: "Guilty as Charged, Guilty of Manslaughter, and Not Guilty." Based on the foregoing, it is impossible to know whether the juror in question intended her verdict to be guilty as charged, guilty of manslaughter, or not guilty and, therefore, leaves open the question of the verdict being unanimous. Neither defense counsel nor the State raised this issue on appeal, as the minute entry reflected a unanimous verdict. However, Louisiana courts have repeatedly held that a jury verdict is discoverable in the pleadings and proceedings for purposes of an error patent review. *State v. Harrell*, 19-371 (La. App. 5 Cir. 7/08/20), 299 So.3d 1274,

---

[4] The polling was done by polling slips provided to the jurors. On each slip, the following was typed: "Is this your verdict?" "Guilty as Charged … YES or NO, Guilty of Manslaughter … YES or NO, and Not Guilty … YES or NO".

1282 n. 14 (citing *State v. Craddock*, 307 So.2d 342 (La. 1975); *State v. Sanford*, 181 So.2d 50 (1965)).  Furthermore, the Louisiana Supreme Court recently held that even "if the non-unanimous jury claim was not preserved for review in the trial court or was abandoned during any stage of the proceedings, the court of appeal should nonetheless consider the issue as part of its error patent review."  *See State v. Gasser*, 19-1220 (La. 6/3/20), 296 So.3d 1022 (*per curiam*); *State v. Ford*, 19-1221 (La. 6/3/20), 296 So.3d 1026 (*per curiam*); *State v. Mesa*, 19-1908 (La. 6/3/20), 296 So.3d 1044 (*per curiam*); *State v. Villafranca*, 19-2093 (La. 6/3/20), 296 So.3d 1057 (*per curiam*).

In *State v. Norman*, 20-0109 (La. 7/2/20), 297So.3d 738, 2020 WL 3603925 (*per curiam*), the Louisiana Supreme Court was faced with a similar situation in that the polling of jurors did not make clear that the verdict was non-unanimous. To determine whether that verdict was, in fact, unanimous, the Court remanded the matter, ordering that the trial court "shall provide a per curiam to this Court within ten days of ruling on the *Ramos* issue and stating the outcome. If the trial court denies relief under *Ramos*, the defendant can appeal separately on that basis. The remainder of the defendant's claims will be considered by this Court once the *Ramos* issue is resolved." *Id.*

We find *Norman* to be instructive in the instant case, and determine that a remand is necessary for clarifying the record on the crucial issue of jury concurrence.  We will further pretermit the defendant's remaining assignment of error pending resolution of any potential *Ramos* issue.

**<u>DECREE</u>**

For the foregoing reasons, we remand this matter to the district court with instructions to review the record to confirm whether the verdict was, in fact, non-unanimous. Once confirmed, the district court shall provide this Court with a *per*

*curiam* within 15 days of its ruling, addressing the *Ramos* issue and stating the outcome of its review.

**REMANDED WITH INSTRUCTIONS**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**APRIL 28, 2021** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT
REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**20-KA-177**

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
GAIL D. SCHLOSSER (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          JANE L. BEEBE (APPELLANT)

**MAILED**
HONORABLE RAYMOND C. BIGELOW          ALCUS A. SMITH #527215 (APPELLANT)          HONORABLE PAUL D. CONNICK, JR.
(DISTRICT JUDGE)                      LOUISIANA STATE PENITENTIARY                (APPELLEE)
JUDGE DIVISION "M"                    ANGOLA, LA 70712                            DISTRICT ATTORNEY
24TH JUDICIAL DISTRICT COURT                                                     DOUGLAS W. FREESE (APPELLEE)
4TH FLOOR, SUITE 4100                                                           SETH W. SHUTE (APPELLEE)
GRETNA, LA 70053                                                                ASSISTANT DISTRICT ATTORNEYS
                                                                               TWENTY-FOURTH JUDICIAL DISTRICT
                                                                               200 DERBIGNY STREET
                                                                               GRETNA, LA 70053