STATE OF LOUISIANA

VERSUS

ANTONIO DANTE KEY

NO. 23-KA-167

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 19-2637, DIVISION "G"
HONORABLE E. ADRIAN ADAMS, JUDGE PRESIDING

December 27, 2023

**FREDERICKA HOMBERG WICKER**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Jude G. Gravois, and Stephen J. Windhorst

**<u>CONVICTION AFFIRMED; SENTENCE AFFIRMED AS AMENDED</u>**
    **FHW**
    **JGG**
    **SJW**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
 Honorable Paul D. Connick, Jr.
 Monique D. Nolan
 Thomas J. Butler
 Zachary L. Grate

COUNSEL FOR DEFENDANT/APPELLANT,
ANTONIO DANTE KEY
 Drew M. Louviere

**WICKER, J.**

Defendant, Antonio Key, appeals his conviction and sentence for aggravated burglary in violation of La. R.S. 14:60. For the following reasons, we affirm defendant's conviction. Upon an errors patent review, we find that the trial court improperly restricted statutory benefits in sentencing defendant, and we amend his sentence to remove the restriction of benefits for the last five years of his twenty-year sentence. In all other respects, we affirm defendant's sentence.

## STATEMENT OF THE CASE

On June 19, 2019, the Jefferson Parish District Attorney filed a bill of information charging defendant with aggravated burglary in violation of La. R.S. 14:60.[1] Defendant was arraigned on that same date and pled not guilty. On February 18, 2020, the State filed a superseding bill of information and a Motion to Invoke Firearm Sentencing Provision Pursuant to Louisiana Code of Criminal Procedure Articles 893.1[2] & 893.3.[3] On March 5, 2020, the State amended the superseding bill of information to allege that defendant committed aggravated burglary while using a firearm and causing bodily injury to Elizabeth McDonald

---

[1] Darius Daleo and Rodgers Hart, III were also charged with aggravated burglary in count one. Additionally, Mr. Hart was charged with attempted armed robbery (count two) and carjacking (count three) in that same bill of information.

[2] La. C.Cr.P. art. 893.1 states:
> A. If the district attorney intends to move for imposition of sentence under the provisions of Article 893.3, he shall file a motion within a reasonable period of time prior to commencement of trial of the felony or specifically enumerated misdemeanor in which the firearm was used.
> B. The motion shall contain a plain, concise, and definite written statement of the essential facts constituting the basis for the motion and shall specify the provisions of this Chapter under which the district attorney intends to proceed.

[3] La. C.Cr.P. art. 893.3, in pertinent part, states:
> D. If the finder of fact finds beyond a reasonable doubt that a firearm was actually used or discharged by the defendant during the commission of the felony for which he was convicted, and thereby caused bodily injury, the court shall impose a term of imprisonment of not less than fifteen years nor more than the maximum term of imprisonment provided for the underlying offense; however, if the maximum sentence for the underlying felony is less than fifteen years, the court shall impose the maximum sentence.
> E. (1)(a) Notwithstanding any other provision of law to the contrary, if the finder of fact has determined that the defendant committed a felony with a firearm as provided for in this Article, and the crime is considered a violent felony as defined in this Paragraph, the court shall impose a minimum term of imprisonment of not less than ten years nor more than the maximum term of imprisonment provided for the underlying offense. In addition, if the firearm is discharged during the commission of such a violent felony, the court shall impose a minimum term of imprisonment of not less than twenty years nor more than the maximum term of imprisonment provided for the underlying offense.

under La. C.Cr.P. art. 893.3(D). On that same date, defendant was re-arraigned and pled not guilty. Defendant filed various pretrial motions and, on July 21, 2021, defendant's pretrial motions to suppress statement, evidence, and identification were denied.

On April 25, 2022, the case proceeded to trial before a twelve-person jury. On April 27, 2022, the jury unanimously found defendant guilty as charged under La. R.S. 14:60 and returned a special verdict under Article 893.3(D). Defendant filed a motion for new trial, which the trial court denied on May 26, 2022. On that date, the trial court sentenced defendant to imprisonment at hard labor for twenty years without benefit of parole, probation, or suspension of sentence. This timely appeal followed.

## FACTS

On April 30, 2019, at 11:57 p.m., the Jefferson Parish Sheriff's Office (JPSO) received a 9-1-1 call from a woman, later identified as Elise McDonald, who reported that someone had just broken into her home through the back door at 4616 Southshore Drive in Metairie. Ms. McDonald subsequently told the 9-1-1 operator that a tall black male wearing black clothing, black gloves, and a black ski mask pointed a gun at her and her mother, later identified as Dr. Elizabeth McDonald, and hit her mother in the head, causing her to bleed.[4] She explained to the 9-1-1 operator that they had barricaded themselves in an upstairs bedroom and were scared to go downstairs.

JPSO Detective Andrew Pennington testified that on April 30, 2019, he was dispatched to a burglary in progress at 4616 Southshore Drive. Detective Pennington explained that he and other responding officers entered through the back door after noticing that the window pane in the back door was broken. He recalled that when they went upstairs, he saw blood on the floor and the wall, and

---

[4] The victims both testified that two perpetrators entered their home.

23-KA-167                                          2

jewelry scattered about. Detective Pennington stated that the responding officers found the two victims on the second floor in a bedroom. He explained that Dr. McDonald had blood on her head and face and that she and her daughter were terrified. He further testified that after ensuring that no one else was in the house, the officers brought the victims downstairs, spoke to them separately, and took statements from them.

Dr. McDonald, a sixty-seven-year-old retired gastroenterologist, testified that she lived at 4616 Southshore Drive with her adult daughter and a large, sixty-pound dog. Dr. McDonald stated that on April 30, 2019, she left the hospital and arrived home at approximately 10:00 p.m. She explained that she and her daughter talked, ate a snack, got ready for bed, and went into to their separate bedrooms and closed their doors at approximately 11:00 p.m. Dr. McDonald testified that at some point, she heard a loud noise and noticed that the alarm was going off. She jumped out of bed, went straight to the alarm panel at the top of the stairs, and realized that there had been a system breach.

Dr. McDonald recalled that as she then ran down the hallway toward her daughter's bedroom, she encountered a masked man with a black hood and black gloves dressed all in black. She also recalled that the man immediately started hitting her with a gun and tried to push her into the bathroom. She explained that she was in "hand to hand" combat with him. Dr. McDonald stated that while she was being hit about the face, shoulders, and chest and being pushed into the bathroom, she looked into her daughter's room and saw another man holding a gun on her daughter. She testified that she attempted to get to her daughter's bedroom to help her, and that she did not care if she died in doing so. She recalled trying to push her daughter's door to keep it open. She testified that, thereafter, the fighting escalated and she was hit multiple times in the head with the perpetrator's gun, until she found herself on the bathroom floor.

Dr. McDonald stated that at some point, the man who was hitting her "raised the hand with the gun," stopped, and said, "Go, go. We got to get - - we got to - - get out. Get out."[5] She stated that the men ran away, that the dog came out of her daughter's room, and that she crawled into her daughter's room. She and her daughter barricaded themselves in her daughter's bedroom by pushing the jewelry box and a large mirror against the door. She recalled that her daughter quickly called 9-1-1 and told them that they needed help. Dr. McDonald also recalled that the 9-1-1 operator stayed on the phone until the police arrived and escorted them from the bedroom. Dr. McDonald testified that EMS came to the scene, after which she went by ambulance to the hospital where she received medical treatment, including for bruising on her body and sutures in her forehead and inside her mouth.

Dr. McDonald testified that she reported to police that on April 11 and 12, 2019, she had air conditioning work done on her house by Bryans United Air Conditioning. She recalled that on April 11, 2019, someone from Bryans United informed her that her back door appeared to be broken. She explained that she immediately had the door repaired on April 12, 2019.

Ms. Elise McDonald testified at trial that she was forty-one years old, a real estate agent, and her mother's assistant. She recalled that on April 30, 2019, at approximately 10:00 p.m., her mother came home from working at the hospital. She and her mother talked, had a snack, watched television, took showers, and then each went to their own bedrooms at approximately 11:00 p.m. She testified that she thereafter heard an extremely loud bang at the back door, glass breaking, the door opening, and the alarm going off. Ms. McDonald stated that she immediately heard

---

[5] Dr. McDonald testified that she was familiar with firearms and that she believed one of the firearms used during the incident was a Glock.

multiple footsteps coming up the stairs. Thereafter, a masked gunman wearing black clothing, black gloves, and a black ski mask opened her door, leaned over her bed, pointed a gun at her, and repeatedly said, "Get to me. Come here. Come to me." She recalled screaming, "No. No. No." Ms. McDonald asserted that her dog was next to her and barking ferociously. She stated that she was trying to crouch down near the side of her bed to protect herself and thought that she was either going to be raped or killed. Ms. McDonald testified that the gunman continued to shout at her, stared at her "like he wanted [her]," and told her to come to him.

Ms. McDonald testified that she subsequently heard scuffling in the hall and knew then that there had to be more than one perpetrator in the home. She then heard her mother shouting and the other perpetrator and her mother fighting. She testified that she had a clear view of her mother in the hallway and saw that the other gunman was beating her mother with his gun. Ms. McDonald explained that the other gunman kept hitting her mother's head and face and trying to shove her mother into the bathroom, but that she kept getting back up. She further explained that when the gunman in her room realized that the gunman in the hallway—who was much smaller—was not "handling" her mother, he went into the hallway, pushed the other gunman out of the way, and began beating her mother harder with his gun. Ms. McDonald explained that she could hear crunching, saw blood spurting, and then realized her mother was not standing up any longer.

Soon thereafter, she heard one of the gunman say, "Let's go. Let's go. Get out of here. We've got to go," after which the gunmen ran. She further testified that her dog chased after the gunmen, that her mother crawled into her (Ms. McDonald's) bedroom as quickly as she could and that they shut the door and tried to barricade themselves in the room.

Ms. McDonald testified that she then called 9-1-1, after realizing that she had pressed the panic button for the alarm system and was concerned that the

police had not yet arrived. Ms. McDonald testified that she could not identify the perpetrators; however, she explained that she could see that the man in the hallway had a lighter skin tone, and the man in her bedroom had a darker skin tone.

Ms. McDonald testified that, on April 11, 2019, she and her mother were both present the entire day when Bryans United performed air conditioning work in their home. She also testified that she was at home by herself during the morning on April 12, 2019, while Bryans United was at the house completing their work, and that she and her mother were both present in the house from midday on April 12, 2019, until Bryans United finished the job at the end of the day. She pointed out that the Bryans United employees walked all over the house during the air conditioning work, both upstairs and downstairs, on those days.

Detective Stoltz[6] testified that while he conducted an investigation at 4616 Southshore Drive, Louisiana State Police troopers were parked on North Causeway Boulevard south of I-10 when they noticed a black Sonata vehicle with tinted windows driving south with no headlights on. Detective Stoltz explained that the state troopers tried to pull the vehicle over, but it would not stop, and a chase ensued. The vehicle ultimately crashed at North Turnbull and Johnson, and three suspects fled the scene on foot.

Detective Stoltz testified after obtaining a search warrant for the vehicle, a 2016 Hyundai Sonata, officers recovered from inside the vehicle a license plate registered to defendant, defendant's driver's license, defendant's debit card, multiple documents with the name "Rhyidh Wilson" on them, and a Nissan key fob for defendant's Nissan Altima. Additionally, Sergeant Randy Thibodeaux with JPSO testified that numerous items were recovered from the Sonata, including a

---

[6] Sergeant Randy Thibodeaux testified that on April 30, 2019, he began the investigation in the instant case by asking the crime lab technicians to take photographs of the scene at 4616 Southshore Drive, obtaining consent from Dr. McDonald for her DNA and swabs of her fingernails, and taking verbal statements from the victims while at that scene. Sergeant Thibodeaux further testified that when his night watch period ended, he turned over the investigation to JPSO Detective Robert Stoltz, the lead investigator.

Taurus pistol, a pair of brown leather gloves, a pair of latex gloves, a black ski mask, a camouflage mask, a white tank top, a black Nike hooded sweatshirt, a black jacket, and a black and gray hooded jacket.

Detective Stoltz explained that although the Sonata vehicle was registered to Ernest Williams, he learned through his investigation that Mr. Wilson was the vehicle's primary driver. Detective Stoltz requested that the second district conduct a disposition check at Mr. Wilson's residence. He testified that a deputy went to that address and spoke to Mr. Wilson, who claimed that his vehicle had been stolen and filed an auto theft report. Suspicious of Mr. Wilson's complaint, JPSO later stopped Mr. Wilson, who was driving defendant's Nissan Altima, and brought him to the investigations bureau for questioning.[7] Detective Stoltz testified that a search warrant was obtained for defendant's Nissan Altima and that during the search, a 9 mm Glock ammunition magazine was retrieved.

Detective Stoltz testified that he interviewed Darius Daleo, one of the individuals who fled the scene at North Turnbull and Johnson and was later captured.[8] Detective Stoltz recalled that Mr. Daleo told officers that he was in the Sonata vehicle with a Rodgers Hart and a third person who he did not know, but who he knew had done air conditioning work at the victims' home. After the victims told Detective Stoltz that Bryans United had recently done air conditioning work on their home, he called Bryans United and asked for the names of the employees who had worked at the victims' home, after which Bryans United confirmed that defendant had recently performed work there.

Detective Stoltz testified that he applied for an arrest warrant for defendant, that defendant was arrested at Bryans United in Gretna on May 2, 2019, and that

---

[7] JPSO also seized Mr. Wilson's cell phone.

[8] Detective Stoltz asserted that Mr. Hart was thereafter arrested, that they seized Mr. Hart's cell phone, and that they obtained a search warrant for his residence. He further asserted that they retrieved evidence from Mr. Hart's residence, which included a Smith and Wesson .40 caliber firearm, a Smith and Wesson box, and a lot of ammunition. Detective Stoltz later testified that after Mr. Hart fled from the scene at North Turnbull and Johnson, he carjacked a nearby pizza delivery driver.

defendant's cell phone was seized from his person upon arrest. He also testified that defendant's residence was later searched pursuant to a search warrant and that several items were recovered, including a Glock pistol box; two live rounds of 9 mm ammunition; six live rounds of 9 mm ammunition; three live rounds of 9 mm ammunition; seven live rounds of 9 mm ammunition; three Glock magazines – a nine round, a thirteen round, and a thirty round; a black jacket; and two pairs of black Adidas pants.

Detective Stoltz further testified that JPSO obtained video surveillance from homes near the scene at 4616 Southshore Drive. He testified that the video evidence from neighborhood surveillance cameras showed the suspected vehicle enter the neighborhood and, at some point, turn its headlights off and park near the corner of Southshore Drive and Brennan Street for approximately seventeen minutes. Other video evidence retrieved from a neighbor's home camera reflects that the lights went off at 4616 Southshore Drive at approximately 11:36 p.m. At 11:40 p.m., two individuals can be seen walking from the east side at the corner of Brennan Street and Southshore Drive and approaching the victims' home. Then, at 11:57 p.m., the vehicle begins moving onto Southshore Drive toward the victims' home. The video evidence shows that, immediately as the vehicle drives past the victims' home, the shadows of two people can be seen running from the residence, getting into the vehicle, and the vehicle fleeing.

Additionally, Detective Stoltz testified that cell phone extractions were performed on defendant's cell phone.[9] As to defendant's cell phone, Detective Stoltz pointed out a photograph retrieved from defendant's phone which showed Ms. McDonald's jewelry box opened and filled with jewelry, with a person's hand

---

[9] Detective Stoltz also testified that cell phone extractions were performed for phones belonging to Mr. Hart, Mr. Daleo, and Mr. Wilson.

in the photograph. He also identified photographs on defendant's cell phone that showed multiple Glock pistols.

Detective Stoltz detailed various text messages and communications between the cell phones of defendant and other individuals. In sum, on April 11, 2019 (the day defendant had been working on the air conditioning at the victims' home), at 4:20 p.m., defendant sent a photograph of Ms. McDonald's jewelry box to Wilson, who asked for the address where the jewelry was located.[10] Defendant sent Wilson the location (4616 Southshore Drive) through text and Wilson then asked whether anyone was present at the home, to which defendant responded affirmatively. On April 29, 2019 (one day prior to the offense in the instant case), at 10:12 p.m., defendant told Wilson he was trying to bring a person to the "lick," which Detective Stoltz stated meant a burglary. Wilson responded that his brakes were "bad." On April 30, 2019 (the day of the offense in the instant case), at 9:40 p.m., defendant sent Wilson a message that he could use the "whip" if he changed the license plate. Detective Stoltz explained that a "whip" meant a vehicle. Defendant told Wilson, "I'll leave you mine." On April 30, 2019, shortly after midnight, Wilson sent a blank text, and defendant responded that he had wrecked Wilson's vehicle. Defendant thereafter sent Wilson a "location drop" in the area of North Turnbull and Johnson where the vehicle crashed. At 12:14:53 a.m., defendant sent another message to Wilson telling him not to come to the location.

Detective Stoltz also detailed text messages between the cell phones of defendant and someone named "Will." On April 26, 2019, at 7:09 a.m., defendant

---

[10] JPSO Sergeant Solomon Burke testified that he was commander of the digital forensics unit. The trial court accepted him as an expert in the field of mobile device forensics. Sergeant Burke testified that he located image 8138, the photograph of the jewelry box, on defendant's cell phone. He asserted that image 8138 was shared by defendant on three occasions. He explained that image 8138 was captured on April 11, 2019, at 4:08:26 p.m. Sergeant Burke pointed out that the last time there was a GPS location for that phone on April 30, 2019, was at 10:38:26 p.m. He also pointed out that the next time there was a GPS location for that phone was on May 1, 2019, at 12:12:37 a.m. Sergeant Burke testified that there were no outgoing calls between 11:44 p.m. and 11:57 p.m. on April 30, 2019, and that the phone did not send any text messages within those times nor was there any app usage during those times.

sent the photograph of the jewelry box to Will. Defendant sent another message to Will saying, "Persons doing it tonight. Drop the lo to your crib. We gone. Head out after. It's me, my partner. Just one or two S." Detective Stoltz stated that "lo" was a location. Will responded with an address in Texas and stated that it would take six hours to get there. Will asked how long defendant would stay in Texas, and defendant responded, "Like two, three days. Probably just to sell some of it." On April 27, 2019, defendant sent a message to Will that they did not "do it" because there were checkpoints due to Jazz Fest. The officers never determined the identity of "Will."[11]

Detective Stoltz testified that he examined the call logs between Mr. Hart and Mr. Daleo. Detective Stoltz testified that Mr. Daleo's phone records showed that he received an incoming call from Mr. Hart on April 30, 2019, at 11:39 p.m., a fifty second call. Next, at 11:40:31 p.m. that night, Mr. Daleo received an incoming call from Mr. Hart—a phone call that lasted seventeen minutes and thirty-five seconds, or until approximately 11:58 p.m. Detective Stoltz acknowledged that the 9-1-1 call was made by Ms. McDonald—who testified that she made the 9-1-1 call immediately after the intruders fled—on April 30, 2019, at 11:57 p.m.

Mr. Daleo testified at trial and admitted that he participated in the offense with Mr. Hart and defendant, who knew each other. He testified that he knew Mr. Hart before the offense but did not know defendant. He explained that he became involved in the instant case after Mr. Hart asked him to go "hit a lick," which he testified meant to steal something. He further testified that defendant knew to "hit this place for a lick" because he had been at the house previously doing air

---

[11] Detective Stoltz pointed out that defendant also sent text messages to someone named "Black." On April 28, 2019, defendant sent a message to Black saying, "You tryna FW this lick in Metairie" and "need a whip. That's all." Black responded that defendant should have told him earlier and asked, "What's the lick?" Defendant responded "BUKU jewelry," which Detective Stoltz interpreted as beaucoup jewelry. The officers never determined the identity of "Black."

conditioning work. Mr. Daleo testified that they did not intend to steal anything that night; rather, he stated Mr. Hart told him they would drive past the house and "peep the scene out."

Mr. Daleo testified that after he got into the car that night, he sat in the driver-side back seat, Mr. Hart sat in the front passenger's seat, and defendant sat in the driver's seat. Mr. Hart told him after they began driving to the victims' home that he would be the getaway driver. He testified that after they arrived near the home, defendant and Mr. Hart put on masks and exited the car as he remained in the car. He further testified that Mr. Hart called him during the burglary so that he could alert Mr. Hart to anything suspicious or to the police's arrival, and that while he was on the phone with Mr. Hart, he heard a dog barking and women screaming. Mr. Daleo testified that he owned the camo mask worn by Mr. Hart that night; he denied ever wearing the mask that night or entering the victims' home.

Mr. Daleo testified that while the three men argued about which way he should drive to get out of the neighborhood, state troopers got behind their vehicle, and a high-speed chase ensued. He further testified that after the car crashed, he hopped out, ran, stopped, and sent his location to his friend, Amber Burquet. Mr. Daleo recalled that as soon as he got into Ms. Burquet's car, he was arrested, approximately thirty minutes after the offense.

Mr. Daleo admitted that he initially denied any involvement in the burglary. However, after speaking with officers and observing surveillance video, he eventually admitted his involvement and told officers that he was driving the vehicle involved in the burglary on Southshore Drive. Mr. Daleo stated that he drove the vehicle out of the neighborhood but that, soon thereafter, he pulled over and switched seats with Mr. Hart by humping over the middle console. He explained that he forgot to turn on the vehicle's headlights and that he switched seats because he was "too messed up" on Xanax and alcohol to drive.

Kortnie Sinon, an expert in the field of latent print processing and comparison, testified that she was formerly employed at the JPSO in the crime lab.[12] Ms. Sinon testified that latent prints obtained from the interior of the Sonata's driver's side rear door handle were identified to be Mr. Daleo's right middle finger and right index finger. She further testified that latent prints obtained from the interior of the Sonata's passenger front door were identified to Mr. Hart's left index finger and right middle finger. Ms. Sinon also testified that she compared a print on a photograph of the hand in the jewelry box to defendant's "major case prints" and determined that the ring finger from the photograph of Dr. McDonald's jewelry box located on defendant's phone matched defendant's left ring finger.

Kara Kovach, an expert in the field of DNA analysis, testified that Mr. Hart could not be excluded as a major contributor to the DNA profile obtained from the swab of the Smith and Wesson pistol, that Mr. Daleo could not be excluded as a major contributor to the DNA profile obtained from the camouflage mask, and that defendant could not be excluded as a major contributor to the DNA profile obtained from the black mask.

Defendant testified at trial that he grew up in New Orleans, graduated from high school in May 2014, left for boot camp in June 2014, and received an honorable discharge from the Marine Corps in 2018. He further testified that he subsequently went to HVAC school, after which he installed and serviced air conditioning units in addition to performing road work.

Defendant testified that on April 11, 2019, he was employed with Bryans United and working at 4616 Southshore Drive. He acknowledged that he took a video of the victims' bathroom because he had never seen a nice bathroom like that before and claimed he wanted "to show my girl or something." He further admitted

---

[12] Ms. Sinon testified that she was the technical reviewer for another examiner in this case, Nikki Wilson, and that she agreed with Ms. Wilson's conclusions.

that he took a picture of the jewelry box in the home because he was enthused by the jewelry. However, he claimed that he did not open the jewelry drawer, that it had already been opened, and that he regretted taking a photo of the jewelry box.[13]

Defendant testified that on April 30, 2019, he used his friend Mr. Wilson's Hyundai Sonata, and further, that he used that vehicle often because it had dark glass tint. He testified that night, he picked up Mr. Hart in Marrero and Mr. Daleo in Bridge City. He insisted that he drove the vehicle that night and that Mr. Daleo never drove it. Defendant recalled that when they arrived near 4616 Southshore Drive, he parked the vehicle nearby because he saw that the lights in the house were on. He claimed that he wanted to leave but that Mr. Daleo insisted that they wait until the lights had been turned off. Defendant stated that he was scared to drive away because Mr. Daleo had a gun and was high. Defendant explained that Mr. Daleo and Mr. Hart exited the vehicle and defendant then repositioned the vehicle so that he could see Mr. Hart and Mr. Daleo walk down the street.

Defendant testified that Mr. Daleo and Mr. Hart returned to the car approximately seventeen minutes later. When asked how he knew when the other two perpetrators were ready to be picked up—given that the video evidence showed the vehicle driving up immediately as the two perpetrators ran away from the house and toward the street—defendant testified that he could see the two men had returned into the victims' front yard because one was using a flashlight on his phone.

Defendant explained that his license plate was found on the floor of the Sonata vehicle and that he never switched the vehicle's license plates because he did not plan on going into the victims' home that evening. He acknowledged that a black ski mask was found in the Sonata but claimed that people his age wear ski

---

[13] On rebuttal, Ms. McDonald testified that she did not have a habit of leaving her jewelry box opened and testified that she did not leave it open on April 11 or 12, 2019, because she knew Bryans United was coming to perform work in the house.

masks rolled up like beanies and that he wore one regularly as a "trend," but testified that he never wore the mask that night and never entered the victims' home.

Defendant admitted that he wanted to steal the jewelry so he could sell it and obtain money. He further testified that he communicated with his friend Mr. Wilson from Texas because he planned to sell the jewelry in Texas and did not want to sell the jewelry locally in New Orleans and be caught.

Deloris Romero testified at trial that she and defendant's mother had been stationed in the Marine Corps together and that she had known defendant since he was six or seven years old. Her impression of defendant's character as a child was that he was very good and very respectful. Ms. Romero testified that over the past few years, she saw defendant once or twice a year and did not have any concerns with his character.

John Michael Anthony testified that he met defendant in 2009, when he (Mr. Anthony) and defendant's mother were working in the Marine Corps. Mr. Anthony asserted that defendant was a student then who did very well in school, played sports, and cut his grass a couple of times. Mr. Anthony maintained that his interactions with defendant continued throughout the years and that those interactions were cordial. He stated that he saw defendant approximately once every two months after defendant left the Marine Corps. He insisted that defendant had a stellar reputation and that defendant treated his mother well.

## LAW AND ANALYSIS

Defendant appeals his conviction and sentence, assigning the following assignments of error: (1) the trial court erred in denying defendant's pretrial motion to suppress the evidence seized from defendant's residence and cell phone; (2) the trial court erred in imposing the firearm enhancement pursuant to La. C.Cr.P. art. 893.1 et. seq because no firearm was discharged during the

commission of the offense; (3) the evidence was insufficient to prove defendant's identity as the perpetrator who committed the aggravated burglary; (4) defendant's 20-year-sentence is constitutionally excessive; and (5) the trial court erred in denying defendant's motions for mistrial. We address each assignment of error in turn.

Sufficiency of the Evidence[14]

On appeal, defendant challenges the sufficiency of the evidence presented against him at trial. Specifically, he contends that the evidence was insufficient to identify him as one of the two perpetrators who physically entered the home and caused injury to the victims. In his brief argument, defendant points out that neither victim was able to identify the perpetrators and, thus, Mr. Daleo was the only witness to testify against him at trial. Defendant asserts that the fingerprint evidence—which demonstrated that Mr. Daleo's fingerprints were found in the getaway vehicle on the rear driver-side door—contradicted Mr. Daleo's testimony that he was driving the getaway vehicle on the night of the crime. Defendant further points out that Daleo is taller than him, and that Dr. McDonald described her assailant as "tall." Defendant claims that he was present but remained in the vehicle on the night of the burglary, but that he did not intend for Mr. Daleo and Mr. Hart to actually enter the victims' home that night.

In reviewing the sufficiency of the evidence, an appellate court must determine if the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d

---

[14] When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, such as the erroneous admission of evidence, the reviewing court should first determine the sufficiency of the evidence by considering all of the evidence, including evidence the trial court may have erroneously admitted. *State v. Hearold*, 603 So.2d 731, 734 (La. 1992); *State v. Mayeux*, 94-105 (La. App. 5 Cir. 6/28/94), 639 So.2d 828, 834.

560 (1979); *State v. Mickel*, 09-953 (La. App. 5 Cir. 5/11/10), 41 So.3d 532, 534, *writ denied*, 10-1357 (La. 1/7/11), 52 So.3d 885; *State v. Ordonez*, 16-619 (La. App. 5 Cir. 3/15/17), 215 So.3d 473, 477. When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 provides, "[A]ssuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." The reviewing court is not required to determine whether a defendant's suggested hypothesis of innocence offers an exculpatory explanation of events. Rather, the reviewing court must evaluate the evidence in the light most favorable to the State and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Baham*, 14-653 (La. App. 5 Cir. 3/11/15), 169 So.3d 558, 566, *writ denied*, 15-40 (La. 3/24/16), 190 So.3d 1189.

Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. Where the key issue is the identification, the State is required to negate any reasonable probability of misidentification to carry its burden of proof. *State v. Ray*, 12-684 (La. App. 5 Cir. 4/10/13), 115 So.3d 17, 20, *writ denied sub nom. State ex rel. Ray v. State*, 13-1115 (La. 10/25/13), 124 So.3d 1096.

Under La. R.S. 14:24, "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." Only those persons who knowingly participate in the planning or execution of a crime are principals to that crime. *State v. Pierre*, 93-893 (La. 2/3/94), 631 So.2d 427, 428; *State v. King*, 06-554 (La. App. 5 Cir. 1/16/07), 951 So.2d 384, 390, *writ denied*, 07-371 (La. 5/4/07), 956 So.2d 600. Mere presence at the scene of a crime does not

make one a principal to the crime. *State v. Page*, 08-531 (La. App. 5 Cir. 11/10/09), 28 So.3d 442, 449, *writ denied*, 09-2684 (La. 6/4/10), 38 So.3d 299. However, "[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention." *State v. Anderson*, 97-1301 (La. 2/6/98), 707 So.2d 1223, 1225.

The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. *State v. Rowan*, 97-21 (La. App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *State v. Dixon*, 07-915 (La. App. 5 Cir. 3/11/08), 982 So.2d 146, 153, *writ denied sub nom. State ex rel. Dixon v. State*, 08-987 (La. 1/30/09), 999 So.2d 745.

Defendant was convicted of aggravated burglary in violation of La. R.S. 14:60, which provides in pertinent part:

> A. Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, under any of the following circumstances:
> (1) If the offender is armed with a dangerous weapon.
> (2) If, after entering, the offender arms himself with a dangerous weapon.
> (3) If the offender commits a battery upon any person while in such place, or in entering or leaving such place.

Battery is "the intentional use of force or violence upon the person of another." La. R.S. 14:33. Aggravated battery is defined as "a battery committed with a dangerous weapon." La. R.S. 14:34. A burglar only needs to have a dangerous weapon in his possession in order to be considered "armed" for purposes of La. R.S. 14:60. It is not required that the burglar use it or brandish it during the commission of the offense. *State v. Hearne*, 55,311 (La. App. 2 Cir.

9/27/23), 2023 WL 6279948, —So.3d— (citing *State v. Rodney*, 19-195 (La. App. 5 Cir. 10/23/19), 282 So.3d 395, 401).

At trial, defendant admitted that on April 11, 2019, he was employed with Bryans United and working at 4616 Southshore Drive. He also admitted that he took a picture of the victim's jewelry while inside their home. Defendant testified that he started planning the robbery on April 11, 2019, while working at the house. He further testified that he engaged in communications with others about coordinating the robbery. Defendant admitted that, prior to the robbery, he sent a picture of the jewelry to other individuals asking for help with "the lick", obtained a vehicle to use in the robbery, and arranged to go to Texas after the robbery to sell the jewelry in an effort to not be caught in Louisiana.

Defendant testified at trial that he stayed in the vehicle while Mr. Hart and Mr. Daleo went into the victims' home. He indicated that he was the getaway driver after Mr. Hart and Mr. Daleo got back into the vehicle. *See State v. Demease*, 33,047 (La. App. 2 Cir. 4/5/00), 756 So.2d 1264, 1269, *writ denied*, 00-1488 (La. 5/25/01), 792 So.2d 750 ("The defendant's confession that he was the getaway driver is direct evidence of his involvement in the offense."). Defendant's testimony indicates that he was at least a principal to aggravated burglary. The jury was instructed on the law of principals.

Nevertheless, Mr. Daleo's testimony calls into question whether defendant was the getaway driver on the night of the robbery. Contrary to defendant's testimony, Mr. Daleo testified at trial that he was the lookout and getaway driver during the robbery, that he stayed in the vehicle while defendant and Mr. Hart went inside the victims' home, and that he (Daleo) and Mr. Hart stayed on their phones during the entire robbery so that he could alert Mr. Hart to any suspicious activity. The phone record evidence introduced at trial confirmed an incoming phone call from Mr. Hart to Mr. Daleo, which lasted approximately seventeen minutes,

between approximately 11:40 p.m. and 12:00 a.m.—during the time of the robbery. If defendant had been the getaway driver and stayed in the vehicle as he claimed, there would be no reason for Mr. Hart and Mr. Daleo to be on the phone with each other for an entire seventeen minutes while both were inside the house during the robbery.

Moreover, the video evidence introduced at trial also calls into question defendant's claim that he was the getaway driver. The video evidence showed a getaway vehicle quickly and promptly arriving at the victims' home immediately as the two perpetrators fled the home. The testimony at trial reflects that defendant's cell phone had no telephone calls, text messaging, or app activity during the entire time of the robbery. With no telephone or other communication between defendant in the getaway car and the perpetrators, it calls into question how defendant, as the getaway driver, knew exactly when to arrive to pick up the two fleeing perpetrators.

Additionally, the evidence reflects that defendant was the only alleged perpetrator who had previously been inside the victims' house and who knew where the jewelry was located in the home. Ms. McDonald recalled that the perpetrators arrived upstairs within seconds of breaking in, which indicates that they knew exactly where to go. Moreover, Mr. Daleo testified at trial that, before the vehicle entered the victims' neighborhood, he was seated in the driver-side back seat with defendant driving the vehicle, and he only moved to the driver's front seat during the time defendant and Mr. Hart were inside of the victims' home to act as the getaway driver. Therefore, the fingerprint evidence placing Mr. Daleo at some point in time in the rear driver-side seat is not inherently contradictory to Mr. Daleo's testimony.

Upon review of the record, we find that the State presented sufficient evidence to support defendant's conviction for aggravated burglary. This assignment of error is without merit.

Motions to Suppress

On May 26, 2021, defendant filed various boilerplate motions to suppress, including motions seeking suppression of all evidence seized with and without a warrant, which the trial court considered at a July 21, 2021 suppression hearing.

On appeal, defendant challenges the veracity of the probable cause affidavits accompanying the applications for search warrants for both his residence and his cell phone, arguing that the applications were defective in that they failed to establish probable cause and omitted material facts or made material misrepresentations. Specifically, defendant claims that the probable cause affidavits contained misrepresentations because they omitted that Mr. Daleo had initially lied to investigating officers concerning his involvement in the robbery.

Defendant contends that the officers' failure to include Mr. Daleo's initial statement denying any involvement in the robbery is a material misrepresentation that renders the warrant unconstitutional. The record reflects that Mr. Daleo initially denied any involvement in the robbery but rather "advised he got out of the vehicle and left" prior to the robbery taking place. The record reflects, however, that, upon further questioning and discussion of the evidence obtained at that point in time, Mr. Daleo admitted participation as the getaway driver and made further statements to the police, which are outlined in the probable cause affidavits.

The State responds that the warrants at issue do not contain misrepresentations and do refer to Mr. Daleo's inconsistent interview, stating that "after a progressive and protracted interview he ultimately confessed to being the driver of the vehicle while Rodgers Hart and an unknown suspect entered the residence armed with handguns." Further, the State asserts that any omission of

Mr. Daleo's previous statement was not intentional and that the probable cause affidavit was prepared in good faith and, thus, the evidence should not be suppressed.

The Fourth Amendment to the United States Constitution and Article I, § 5 of the Louisiana Constitution prohibit unreasonable searches and seizures. *State v. Thomas*, 08-390 (La. App. 5 Cir. 1/27/09), 8 So.3d 80, 83, *writ denied*, 09-626 (La. 11/25/09), 22 So.3d 170. If evidence is derived from an unreasonable search or seizure, the proper remedy is exclusion of the evidence from trial. *Id.*; *State v. Aston*, 12-955 (La. App. 5 Cir. 9/4/13), 125 So.3d 1148, 1156, *writ denied*, 13-2374 (La. 3/21/14), 135 So.3d 618.  As a general rule, searches and seizures must be conducted pursuant to a validly executed search warrant or arrest warrant. *State v. Holmes*, 08-719 (La. App. 5 Cir. 3/10/09), 10 So.3d 274, 278, *writ denied*, 09-816 (La. 1/8/10), 24 So.3d 857. Probable cause for the issuance of a search warrant "exists when the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information, are sufficient to support a reasonable belief that an offense has been committed and that evidence or contraband may be found at the place to be searched." *State v. Lee*, 05-2098 (La. 1/16/08), 976 So.2d 109, 122, *cert. denied*, 555 U.S. 824, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008).

A magistrate must be given enough information to make an independent judgment that probable cause exists to issue a warrant. *Green*, 831 So.2d at 968. Moreover, the process of determining probable cause simply requires that enough information be presented to the issuing magistrate to enable the magistrate to determine that the charges are not capricious and are sufficiently supported to justify bringing into play further steps of the criminal justice system. *State v. Brown*, 09-722 (La. App. 4 Cir. 2/10/10), 32 So.3d 939, 950.  The magistrate's determination of probable cause to issue a search warrant is entitled to significant

deference on review, and "marginal cases should be resolved in favor of a finding that the issuing magistrate's judgment was reasonable." *State v. Rodrigue*, 437 So.2d 830, 833 (La. 1983).

The magistrate must make a common sense and non-technical decision as to whether, given information contained in the affidavit, there is a "fair probability" that evidence of a crime will be found in the place to be searched. *State v. Brown*, 18-01999 (La. 9/30/21), 330 So.3d 199, 252, *cert. denied*, 142 S. Ct. 1702, 212 L. Ed.2d 596 (2022), citing *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). The task for a reviewing court is simply to ensure that under the totality of the circumstances, the magistrate had a substantial basis for concluding that probable cause existed. *State v. Payne*, 10-46 (La. App. 5 Cir. 1/25/11), 59 So.3d 1287, 1296, *writ denied*, 11-387 (La. 9/16/11), 69 So.3d 1141.

Nevertheless, the United States Supreme Court has held that evidence seized pursuant to a warrant based on less than probable cause need not be suppressed if the officers who executed the warrant believed it to be validly issued. *State v. Davis*, 17-642 (La. App. 5 Cir. 12/11/17), 2017 WL 10118514, at 2 (citing *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d. 677 (1984)). In formulating this judicially created good faith rule, the Court reasoned that the good faith of an officer in the execution of a warrant signed by a neutral magistrate should be enough for the evidence obtained as a result of the search to be admissible. *Id*. Thus, the Court expressed a strong preference for warrants over warrantless searches by allowing evidence seized in constitutionally questionable searches to be admissible into evidence if the officers relied on a validly issued warrant. *Id*; *State of Louisiana v. Jalin Cosse In re State of Louisiana*, 23-198 (La. App. 5 Cir. 5/19/23), —So.3d—, 2023 WL 3559763.

In *United States v. Leon*, *supra*, the Supreme Court held that evidence seized under a constitutionally defective warrant should not be suppressed where the

officers acted in good faith and in objectively reasonable reliance on the validity of the warrant. The *Leon* court enumerated four instances in which suppression remains an appropriate remedy: (1) where the magistrate or judge was misled by information the affiant knew was false or would have known was false except for a reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his detached and neutral judicial role; (3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient, i.e., fails to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid. *Leon*, 468 U.S. at 914-15, 104 S.Ct. at 3416.

Specifically concerning alleged misrepresentations made in a probable cause affidavit, the Louisiana Supreme Court recently stated:

> Regarding defendant's claim that the affidavit was based on omissions or misleading information, an affidavit is presumed to be valid, and the defendant has the burden of showing by a preponderance of the evidence that the affidavit contains false statements. *Franks v. Delaware*, 438 U.S. 154, 156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978); *State v. Brannon*, 414 So.2d 335, 337 (La. 1982); *State v. Ogden*, 391 So.2d 434, 439 n.7 (La. 1980); *State v. Wollfarth*, 376 So.2d 107, 109 (La. 1979). Once the defendant has shown the affidavit contains false statements, the burden shifts to the state to prove the veracity of the allegations in the affidavit. If the court finds that the affidavit contains misrepresentations, it must decide whether they were intentional. *State v. Smith*, 397 So.2d 1326, 1330 (La. 1981); *State v. Fairbanks*, 467 So.2d 37, 39-40 (La. App. 4 Cir. 1985). If the court finds that the misrepresentations were intentional, the search warrant must be quashed. *Smith*, 397 So.2d 1326, 1330. On the other hand, if the court finds that the misrepresentations were inadvertent or negligent, the inaccurate statements should be excised and the remaining statements tested for probable cause. *State v. Lee*, 524 So.2d 1176, 1181 (La. 1987).

*State v. Brown*, 2018-01999 (La. 9/30/21), 330 So. 3d 199, 252–53, cert. denied, 142 S. Ct. 1702, 212 L. Ed. 2d 596 (2022).

Concerning the search or extraction of cell phones, the United States Supreme Court has found that the police generally may not, without a warrant,

search digital information on a cell phone seized from an individual who has been arrested. *Riley v. California*, 573 U.S. 373, 134 S. Ct. 2473, 2477, 189 L.Ed.2d 430 (2014). In reaching this conclusion, the Court observed that modern cell phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley*, 573 U.S. at 385, 134 S.Ct. at 2484. However, "[g]iven the pervasiveness of cell phones, the Supreme Court also recognized that they "have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals." *Riley*, 573 U.S. at 401, 134 S.Ct. at 2493.

In this case, defendant's residence and cell phone were both searched after the issuance of a search warrant. As to the search warrant for defendant's cell phone extraction, the probable cause affidavit in pertinent part stated:

> Detectives spoke to Darius Daleo and after a progressive and protracted interview he ultimately confessed to being the driver of the vehicle while Rodgers Hart and an unknown suspect entered the residence armed with handguns. He indicated that Hart asked him to drive and be a lookout during the robbery. The unknown suspect indicated that he worked for the air conditioning company that did work at the house and that there was about 50K in valuables that they could steal and further that it was a soft target due to the fact that only two women lived there and the rear door was faulty. Ultimately Daleo identified Hart from a photographic line-up, but was unable to identify the other suspect.
>
> Daleo indicated that he was on the phone with Hart the entire time of the incident and overheard their approach to the residence, entry and subsequent altercation with the women, hearing their screams over the phone. Daleo indicated that the suspects exited and entered the vehicle and fled. He advised that Hart took over driving the vehicle and was the driver during the pursuit. A search of his phone confirmed the call for approximately seventeen minutes to Hart's phone during the crime. Daleo was· later booked for the incident. A search of the suspect vehicle recovered by LSP revealed several items related to one Antonio Key to include his old Louisiana Driver's License and a license plate to his vehicle, described as a 2016 Jeep Patriot. During the course of the investigation detectives learned that the victims recently had several contractors in their residence performing renovations. One of the companies was Bryans United Air Conditioning.

Investigators soon learned that Antonio Key was employed as "helper" for Bryans United and was a member of the crew that replaced ducts in the victims' residence in mid-April.

Based on the entirety of the investigation, an arrest warrant was obtained for Key for Aggravated Burglary. On May 2, 2019 at approximately 0700 hours, Key was taken into custody for this investigation and had his Apple I-phone on his person when apprehended by investigators. Key was transported to the Criminal Investigations Bureau for a formal interview. Key was advised of his rights per Miranda. Key denied any involvement of this incident and refused to give investigators the passcode for his locked Apple I-phone. Detective Augillard request a search warrant for Key's mobile device to extract any and all data pertinent for this investigation.

As to the search warrant for defendant's residence, the probable cause

affidavit stated in pertinent part:

Police officers pursued the suspects who occupied a black Hyundai Sonata until the suspects crashed the Hyundai. Three black males ran from the Hyundai. Members of the Jefferson Parish Sheriff's Office took one suspect, Darius Daleo, into custody. Daleo confessed to his involvement in the aggravated burglary and identified Rodgers Delio, B/M, DOB: 9/25/1995 and a young black male (unknown name) who is employed by and air conditioning company that just completed work at the victim's house. Daleo said the suspect employed by the air condition company arranged the aggravated burglary, stating that the suspects could gain $50,000 in the burglary of the residence.
Investigators obtained a search warrant for the suspect's Hyundai. During the search of the car, masks and other items related to the crime were recovered. Also, a driver's license in the name of Antonio Key, B/M, DOB: 10/03/1996 was found in the passenger compartment of the Hyundai. Detectives learned that Key is employed by the air conditioning company that completed work at the victim's house just a couple of weeks prior to the aggravated burglary, and that Key worked at that that job site. Detectives also secured phone communications between Key and another suspect in the crime that further indicates his involvement in the crime.

A warrant of arrest for Antonio Key for violation of LRS 14:60 Aggravated Burglary was obtained on May 1, 2019.

On May 2nd, 2019, detectives arrested Key at his place of employment. He arrived to work in a 2018 Nissan Sentra bearing Louisiana license plate# 460BCG. Detectives learned from Key that he resides at 2700 Whitney Avenue, Building 23, Apartment 469, Harvey, Louisiana. It is based on the above information that detectives request a warrant to search Antonio Key's residence located at 2700 Whitney Avenue, Building 23, Apartment 469, Harvey in an attempt to recover evidence of the crime.

Upon thorough review, we find that the trial judge did not abuse his discretion in denying defendant's motions to suppress. There is no evidence to demonstrate that any omission of Mr. Daleo's prior statement in the probable cause affidavits was intentional. Further, we find the applications demonstrate that the attesting officers had reasonable grounds to believe that defendant's residence and cell phone may have evidence of the crime at issue—including text or other cell phone communication to show the "arrangements" or planning of the crime following defendant's presence in the home while performing air conditioning work. We also find that the warrants were not so lacking of indicia of probable cause that the magistrate's belief in its existence was entirely unreasonable. Finally, there is no evidence to show that the officers executing the warrants were not acting in good faith in relying on a validly issued warrant. Therefore, we find the trial judge did not abuse his discretion in denying defendant's motions to suppress. This assignment lacks merit.

Firearm Enhancement under La. C.Cr.P. art. 893.1 et seq.

Defendant further argues that the trial court erred in applying the sentencing enhancement under La. C.Cr.P. art. 893.1 et seq., asserting that there is not sufficient evidence to prove that he possessed or used a firearm in connection with the robbery. He contends that, pursuant to La. C.Cr.P. art. 893.3, the State must prove that defendant discharged or used the firearm as a firearm, not as a bludgeon weapon to injure the victim. He argues that pistol-whipping does not meet the statutory definition under Article 893.3(D).

On February 18, 2020, the State filed a motion to invoke the firearm sentencing provision under La. C.Cr.P. arts. 893.1 and 893.3. The State asserted in that motion that La. C.Cr.P. art. 893.3(E) was implicated in the instant case. On March 5, 2020, the State amended the superseding bill of information to allege that defendant and his co-defendants committed an aggravated burglary while using a

firearm thereby causing bodily injury to Dr. McDonald, pursuant to Article 893.3(D). The jury subsequently found defendant guilty as charged of aggravated burglary. The jury also found the following special verdict: "We, the jury, find that the State of Louisiana, proved beyond a reasonable doubt that the defendant actually used a firearm during the offense, causing bodily injury."

At the time of the offense on April 30, 2019, Article 893.3(D) provided:

> D. If the court finds by clear and convincing evidence that a firearm was actually used or discharged by the defendant during the commission of the felony for which he was convicted, and thereby caused bodily injury, the court shall impose a term of imprisonment of fifteen years; however, if the maximum sentence for the underlying felony is less than fifteen years, the court shall impose the maximum sentence.

Article 893.3(D) provides a mandatory minimum sentence of fifteen years for defendant's conviction and is not an additional sentence. *See State v. Dowden*, 41,939 (La. App. 2 Cir. 3/28/07), 954 So.2d 300, 310, *writ denied*, 07-909 (La. 11/9/07), 967 So.2d 501 ("The plain wording of La. C.Cr.P. art. 893.3(B) addresses the total term of imprisonment, not an 'add-on' of time."). *See also State v. Lee*, 02-1793 (La. App. 4 Cir. 4/2/03), 844 So.2d 970, *writ denied*, 03-1247 (La. 10/10/03), 855 So.2d 330 (On an errors patent review, the Court determined "that provision [La. C.Cr.P. art. 893.3(A)] merely provides for a two-year mandatory minimum sentence for an offense for which defendant has been convicted, not an additional sentence on top of the sentence imposed for the conviction.").

Article 893.3(D) specifically provides that the enhancement is applicable when "a firearm was actually used or discharged by the defendant during the commission of the felony for which he was convicted, and thereby caused bodily injury." It appears that the wording of this statute is clear and unambiguous and should be applied as written. If the firearm had to be discharged for Article 893.3(D) to apply, the legislature would not have stated "used or discharged" when writing the article. Additionally, it appears that there was clear and convincing

evidence that showed defendant used a firearm during the burglary of 4616 Southshore Drive that caused bodily injury to Dr. McDonald. Dr. McDonald testified that one of the perpetrators beat her with his gun in the hallway, and Ms. McDonald testified that the other perpetrator left her in the bedroom and went out into the hallway, where he also beat her mother with his gun. Therefore, the evidence demonstrates that both perpetrators used a firearm to cause bodily injury to Dr. McDonald.

Upon review of the record and the applicable law, we find that the State presented sufficient evidence to show that defendant used a firearm to cause the victim, Dr. McDonald, bodily injury as contemplated under La. C.Cr.P. art. 893.3(D). This assignment is without merit.

Excessive Sentence

Defendant next challenges the constitutionality of his sentence on appeal.[15] Defendant argues that his twenty-year sentence is constitutionally excessive given that he is a Marine Corps veteran with no prior criminal history with a low recidivism risk. Defendant points to the character witnesses who demonstrated that he is a good person who loves his family and contributes to society as demonstrated by his military service and his HVAC career.

Defendant's trial counsel did not object to the sentence imposed, and he did not file a motion to reconsider sentence. This Court has consistently held that a defendant's failure to make or file a motion to reconsider sentence limits the defendant to a review of the sentence for constitutional excessiveness only. La. C.Cr.P. art. 881.1(E). *See also State v. Bartholomew*, 18-670 (La. App. 5 Cir. 10/23/19), 282 So.3d 374, 384-85.

The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment.

---

[15] See Errors Patent discussion concerning the 24-hour delay required under La. C.Cr.P. art. 873.

Although a sentence is within statutory limits, it can be reviewed for unconstitutional excessiveness. *State v. Smith*, 01-2574 (La. 1/14/03), 839 So.2d 1, 4. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. *Id.* A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. *State v. Lawson*, 04-334 (La. App. 5 Cir. 9/28/04), 885 So.2d 618, 622.

A trial judge has broad discretion when imposing a sentence because he or she is in the best position to consider the aggravating and mitigating circumstances of a particular case. *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957, 958, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). A reviewing court may not set a sentence aside absent a manifest abuse of discretion. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. *State v. Dorsey*, 07-67 (La. App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130. The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D); *State v. Pearson*, 07-332 (La. App. 5 Cir. 12/27/07), 975 So.2d 646, 656.

In reviewing a trial court's sentencing discretion, three factors are considered: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts. *State v. Hankton*, 20-388 (La. App. 5 Cir. 7/3/21), 325 So.3d 616, 623, *writ denied*, 21-1128 (La. 12/7/21), 328 So.3d 425.

Defendant was sentenced pursuant to La. R.S. 14:60(B) and La. C.Cr.P. art. 893.3(D).  La. R.S. 14:60(B) provides, "Whoever commits the crime of aggravated burglary shall be imprisoned at hard labor for not less than one nor more than thirty years." Also, at the time of the offense, Article 893.3 provided, in pertinent part, that "[i]f the court finds by clear and convincing evidence that a firearm was

actually used or discharged by the defendant during the commission of the felony for which he was convicted, and thereby caused bodily injury, the court shall impose a term of imprisonment of fifteen years." Therefore, defendant faced a 15-year minimum sentence under La. C.Cr.P. art. 893.3 and a 30-year maximum sentence under La. R.S. 14:60.

We find the twenty-year sentence imposed is well within statutory range and is not constitutionally excessive under the facts of this case.[16] Although defendant is a first-time offender and an honorably discharged military veteran, the evidence reflects that he planned to burglarize the victims' home after being inside the home to perform air conditioning work. The evidence reflected that defendant was the mastermind who planned the entire burglary.

The evidence also showed that defendant went inside the home late at night—with the knowledge that the victims were inside the home—and terrorized Ms. McDonald and her sixty-seven-year-old mother, whom he beat with a gun along with his accomplice.

Dr. McDonald read her victim impact statement at the sentencing hearing, during which she stated that words were inadequate to explain the terror and evil she and her daughter experienced that night. She also stated that the incident changed her life forever, that she and her daughter still do not feel completely safe in their home, and that she has post-traumatic stress disorder, post-concussion syndrome, headaches, memory issues, and hearing issues. Dr. McDonald testified that she had to close her medical practice due to her injuries and that she continued to see therapists regularly. She believed that defendant and his accomplice had a plan to harm her daughter that night as well, but that she was in their way. As such, she asked the trial court to impose the maximum sentence.

---

[16] We further find that the 20-year sentence imposed is supported by jurisprudence for similar crimes. *See State v. Calhoun*, 42,896 (La. App. 2 Cir. 1/16/08), 974 So.2d 805, 814-15, *writ denied sub nom. State ex rel. Calhoun v. State*, 08-579 (La. 11/26/08), 997 So.2d 544.

Likewise, Ms. McDonald read her victim impact statement at the sentencing hearing. She stated that the incident changed her life forever; that it was an "absolute terror;" that she thought she was going to be raped and murdered; that the perpetrator in her room was seemingly unfazed by the alarm going off, the dog barking, and her desperate screaming; that there were no words to adequately express the nightmare she and her mother experienced and continued to experience on a daily basis; that she is still in therapy and has been diagnosed with post-traumatic stress disorder; that she is fearful that defendant and his co-defendants know where she and her mother live; and that she is afraid they may return one day to harm them further. She asked the trial judge to impose the maximum sentence for these reasons.

Upon review of the record, we find that defendant's mid-range twenty-year sentence is supported by the facts of this case. This assignment is without merit.

Motions for Mistrial

In his final assignment of error, defendant contends that the trial court erred in denying his three oral motions for mistrial, each discussed below.

A mistrial is a drastic remedy and is warranted only when trial error results in substantial prejudice to the defendant that deprives him of a reasonable expectation of a fair trial. *State v. Williams*, 14-40 (La. App. 5 Cir. 9/24/14), 151 So.3d 79, 83, *writ denied*, 14-2250 (La. 6/19/15), 172 So.3d 649. Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771. La. C.Cr.P. art. 775. The granting of a mistrial is within the discretion of the trial court if the trial court is satisfied that an admonition is not sufficient to assure the defendant a fair trial. *State v. Williams*, 04-1309 (La. App. 5 Cir. 4/26/05), 902

So.2d 485, 496, *writs denied*, 05-1640 (La. 2/3/06), 922 So.2d 1173 and 05-1640 (La. 2/3/06), 924 So.2d 144.

First, defendant alleges that a mistrial was warranted because the trial court improperly admitted unauthenticated video evidence of a Louisiana State Police trooper's dash-camera, which showed a police car chase involving the Sonata vehicle that ultimately crashed. He claims that the video evidence was inadmissible because it was not properly authenticated by the state trooper driving the vehicle. He further argued that improperly admitting the evidence was prejudicial because it showed a car chase, presumably involving defendant, on a public road potentially endangering other travelers on the road.

La. C.E. art. 901(A) provides, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *See State v. Rice*, *17-0446 (La. 6/29/17), 222 So.3d 32, 33*. Detective Stoltz testified that during his investigation into the aggravated burglary in the instant case, he received the dash-camera footage and the body camera footage from the Louisiana State Police relative to the police chase of the Sonata following the incident at 4616 Southshore Drive. Upon review of the record, we find that Detective Schultz's testimony concerning his receipt of the video evidence through his investigation of the instant offense is sufficient under La. C.E. art. 901.

Nevertheless, even if the evidence had been improperly admitted, the erroneous admission of improperly authenticated evidence is subject to a harmless error analysis. *State v. Matthews*, 22-422 (La. App. 3 Cir. 11/16/22), 353 So.3d 301. The test is whether there is a reasonable possibility the error might have contributed to the conviction and whether the court can declare a belief that the error is harmless beyond a reasonable doubt. *State v. Magee*, 11-574 (La. 9/28/12), 103 So.3d 285, *cert. denied*, 571 U.S. 830, 134 S.Ct. 56, 187 L.Ed.2d 49 (2013).

Under the facts of this case, and given that this Court has found the evidence introduced at trial sufficient to convict defendant (without relying on the dash-camera footage at issue), we find that any error concerning the dash-camera footage did not contribute to the verdict and that the error, if any, would be harmless given the evidence presented against defendant in this case.

Second, defendant claims that the trial court erred in denying his motion for mistrial when the prosecutor in closing argument referred to defendant and/or his counsel as a "clown." During closing argument, the prosecutor made the following remarks when discussing defense counsel's previous argument that the State failed to test for DNA any clothing recovered from the vehicle:

> But as the defense changed from attempt to not guilty to justification or whatever it was - - because he admitted his role in this, as he admitted to it, like he was going to. What do you think the DNA - - if Dr. McDonald's blood was actually on any of those jackets, what do you think the defense is? That's not the jacket I wore. And then where are we? Right back to square one with this clown.

Defense counsel immediately commented, "Judge, Judge. I don't know who he was talking about –", to which the prosecutor immediately replied, "This clown defense....I meant to say clown defense." The parties approached the bench and defense counsel argued that the prosecutor's remark was inappropriate and requested sanctions. The prosecutor explained that he meant to say "clown defense" in response to defense counsel's closing argument concerning lack of DNA testing, stating that the argument was "nonsensical." The trial judge admonished the State, commenting that it was improper for the prosecutor to refer to either defense counsel or defendant as a clown. The prosecutor again apologized.

La. C.Cr.P. art. 774 governs opening and closing arguments and provides:

> The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.

The argument shall not appeal to prejudice.

The state's rebuttal shall be confined to answering the argument of the defendant.

A prosecutor has considerable latitude in making closing arguments. *State v. Williams*, 03-942 (La. App. 5 Cir. 1/27/04), 866 So.2d 1003, 1014, *writ denied*, 04-450 (La. 6/25/04), 876 So.2d 832. A conviction will not be reversed due to improper remarks during closing argument unless the reviewing court is thoroughly convinced that the remarks influenced the jury and contributed to the verdict. *State v. Harris*, 17-78 (La. App. 5 Cir. 10/25/17), 230 So.3d 285, 298, *writ denied*, 17-1968 (La. 6/15/18), 257 So.3d 680.

Upon review of the record, we find that the remark made by the prosecutor was improper and falls under La. C.Cr.P. art. 771[17], which instructs that:

> [T]he court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury: (1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770.[18]

We find that the trial court properly admonished the prosecutor for his improper remark and point out that the jury was further instructed that closing arguments are not evidence to be considered in rendering a verdict. We therefore find that the trial court did not abuse his discretion in denying the motion for mistrial on this basis.

---

[17] La. C.Cr.P. art. 771 provides:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

[18] La. C.Cr.P. art. 770 instructs that certain comments concerning "race, religion, color or national origin" may warrant an automatic mistrial.

Third, defendant contends that the trial court erred in denying his motion for mistrial on the basis that the prosecutor allegedly allowed Mr. Daleo to misrepresent facts surrounding his plea deal and permitted him to testify on cross-examination that he received no benefit for his testimony. The State responds that Mr. Daleo did not testify untruthfully and repeatedly testified that he did receive a plea deal in exchange for his truthful testimony at trial.

Mr. Daleo testified on direct examination that he pled guilty in the instant case to aggravated burglary and received an eight-year sentence. During cross-examination, defendant's trial counsel questioned Mr. Daleo extensively about the plea agreement. Mr. Daleo testified that he and his co-defendants had been charged with aggravated burglary with a firearm causing bodily injury but that, pursuant to his plea agreement, the State amended the bill of information only as to him to remove the firearm enhancement under La. C.Cr.P. art. 893.3. On cross-examination, in a confusing series of questions by defense counsel, Mr. Daleo responded "No," when questioned if he received a benefit for his testimony at trial. This statement is the basis for defendant's motion for mistrial.

However, the transcript of Mr. Daleo's testimony clearly reflects that he testified concerning the terms of his plea agreement. Mr. Daleo testified that he made a "plea deal" with the State to reduce his sentencing exposure in exchange for his testimony at trial. Upon review of the testimony and record, we find no error in the trial court's denial of defendant's motion for mistrial on this basis.

This assignment of error lacks merit.

## ERRORS PATENT

We have reviewed the record for errors patent in accordance with La. C.Cr.P. art. 920; *State v. Oliveaux,* 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990).

First, our review indicates that the trial court resentenced defendant on the same date that it denied his motion for new trial. La. C.Cr.P. art. 873 provides:

> If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

Thus, La. C.Cr.P. art. 873 requires a 24-hour delay between the denial of a motion for new trial and sentencing, unless a defendant expressly waives the 24-hour delay period.[19] *State v. Perez-Espinosa*, 19-601 (La. App. 5 Cir. 9/22/20), 302 So.3d 598, 603. The Louisiana Supreme Court recently instructed that failure to comply with the 24-hour delay mandated by Article 873 is an error patent on the face of the record. However, the Court further instructed that an error in failing to observe the statutory sentencing delay may be found harmless. *State v. Kisack*, 16-0797 (La. 10/18/17), 236 So.3d 1201, 1205–06.

Failure to observe the 24-hour delay period has been considered harmless where there is a sufficient delay between the date of conviction and the date of sentencing; there is no indication that the sentence is hurriedly imposed; and there is no argument or showing of actual prejudice by the failure to observe the twenty-

---

[19] See *State v. Davis*, *13-52 (La. App. 5 Cir. 8/27/13), 123 So.3d 751, 757–58* (wherein this Court found defendant expressly waived the 24-hour delay by affirmatively stating he was present for sentencing); *State v. James,* 527 So.2d 504, 505 (La. App. 5 Cir.1988) (wherein this Court found that the defendant had waived the Article 873 sentencing delay when his counsel affirmatively responded that the defendant was prepared for sentencing); *State v. Green,* 04–357 (La. App. 5 Cir. 11/16/04), 890 So.2d 6, 12 (wherein this Court found defendant validly waived the delay required by Article 873 when defense counsel agreed that the defendant could be sentenced); and *State v. Morton,* 12–27 (La. App. 5 Cir. 5/31/12), 97 So.3d 1034, 1045, *writ denied,* 12–1476 (La.1/18/13), 107 So.3d 625 (wherein this Court found that the defendant waived the sentencing delay required by Article 873 based on the defendant's affirmative statement that he was prepared for sentencing).

four hour delay. *State v. Foster*, 02-0910 (La. App. 4 Cir. 12/11/02), 834 So.2d 1188, 1192, approvingly cited in *Kisack, supra*.

In this case, immediately following the denial of defendant's motion for new trial, the State stated that defendant had filed a sentencing memorandum but that the State first would like to move forward with the reading of the victim impact statements. After the reading of the two victim impact statements, the trial court questioned, "Is the matter submitted for sentencing?" to which the State responded "Submitted. Do you have anything, John [defense counsel]?" to which defense counsel stated "Judge, we have a statement from two people." Thereafter, defendant made a statement and two witnesses testified on defendant's behalf as to his character, family, and service in the Marine Corps. Following defendant's statement and the two defense character witnesses' testimony, the trial judge again asked, "Is the matter submitted?" At that point, defense counsel responded, "Yes." At that point, the trial court sentenced defendant.

Upon review of the record, we find that the trial court erred in failing to observe the 24-hour delay mandated by La. C.Cr.P. art. 873. However, under the facts of this case, given counsel's statements at sentencing, the preparation and filing of a sentencing memorandum by defense counsel, the presence of defense character witnesses called and prepared to testify at the hearing, and the reasonableness of the sentence given, we find the error in this case to be harmless and, therefore, does not necessitate a remand for resentencing.

Second, our review reflects an error patent concerning statutory restrictions imposed during sentencing. The transcript reflects that the trial judge sentenced defendant to imprisonment at hard labor for twenty years without benefit of parole, probation, or suspension of sentence. Defendant was sentenced under La. R.S. 14:60(B) and La. C.Cr.P. art. 893.3.

La. R.S. 14:60(B) provides, "Whoever commits the crime of aggravated burglary shall be imprisoned at hard labor for not less than one nor more than thirty years." At the time of the offense, La. C.Cr.P. art. 893.3 provided in pertinent part:

> D. If the court finds by clear and convincing evidence that a firearm was actually used or discharged by the defendant during the commission of the felony for which he was convicted, and thereby caused bodily injury, the court shall impose a term of imprisonment of fifteen years; however, if the maximum sentence for the underlying felony is less than fifteen years, the court shall impose the maximum sentence.
>
> ****
>
> F. A sentence imposed under the provisions of this Article shall not be suspended and shall be imposed in the same manner as provided in the felony for which the defendant was convicted.
>
> G. A defendant sentenced under the provisions of this Article shall not be eligible for parole during the period of the mandatory minimum sentence[.]

When sentencing defendant, the trial judge ordered the entirety of the twenty-year sentence to be served without benefit of parole, probation, or suspension of sentence. However, La. R.S. 14:60 does not include a restriction of benefits for the sentence for aggravated burglary. Nevertheless, La. C.Cr.P. art. 893.3 does include a restriction of benefits. La. C.Cr.P. art. 893.3(F) provides that the sentence shall not be suspended. Moreover, La. C.Cr.P. art. 893.3(G) states that "[a] defendant sentenced under the provisions of this Article shall not be eligible for parole *during the period of the mandatory minimum sentence*." (emphasis added).[20] The trial court sentenced defendant under La. C.Cr.P. art. 893.3(D), which sets forth the statutory mandatory minimum sentence of fifteen years.

We find that, pursuant to the clear statutory language provided in La. C.Cr.P. art. 893.3(D) and 893.3(G), the trial court erred in restricting defendant's benefits for the entirety of his twenty-year sentence and could only restrict defendant's benefits for the statutorily designated mandatory minimum sentence, or, fifteen

---

[20] Further, Article 893.3 does not reference probation; however, because there is a mandatory minimum fifteen-year sentence, the trial court was precluded from considering probation.

years.  Accordingly, we hereby amend defendant's sentence to remove the restriction of benefits for the last 5 years of his sentence.

Third, the sentencing transcript reflects that the trial court failed to properly advise defendant of the provisions of La. C.Cr.P. art. 930.8, which states in pertinent part, "[n]o application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of Article 914 or 922."  If a trial court fails to advise, or provides an incomplete advisal, pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief by means of its opinion. *State v. Mouton*, 22-444 (La. App. 5 Cir. 12/29/22), 358 So.3d 106, 122-23. Therefore, we hereby advise defendant that no application for post-conviction relief, including applications that seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.  *See State v. Wall, 21-716 (La. App. 5 Cir. 12/7/22)*, 362 So.3d 847, 855, *writ not considered*, 23-00375 (La. 8/2/23), 368 So.3d 64, *reconsideration denied*, 23-00375 (La. 11/15/23).

**<u>DECREE</u>**

For the reasons stated herein, we affirm defendant's conviction for aggravated burglary in violation of La. R.S. 14:60, but amend defendant's sentence only to remove the restriction on benefits for the last five years of his sentence as stated herein.  The Clerk of Court for the 24th Judicial District Court is hereby ordered to transmit notice of this amended sentence to the appropriate authorities

pursuant to La. C.Cr.P. art. 892(B)(2) and the Department of Corrections' legal department. *See State v. Brown*, *17-346 (La. App. 5 Cir. 12/13/17), 234 So.3d 1134, 1137.* In all other respects, defendant's sentence is affirmed.

**<u>CONVICTION AFFIRMED;</u>**
**<u>SENTENCE AFFIRMED AS AMENDED</u>**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **DECEMBER 27, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**23-KA-167**

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE E. ADRIAN ADAMS (DISTRICT JUDGE)
MONIQUE D. NOLAN (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          DREW M. LOUVIERE (APPELLANT)

### MAILED
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
ZACHARY L. GRATE (APPELLEE)
ASSISTANT DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053